E-FILED
Thursday, 09 December, 2004  02:45:01 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 01-30110 |
| | ) | |
| SERGIUS RINALDI, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

The Defendant's motion to withdraw his plea of guilty was denied in February 2003.

He now seeks reconsideration of that ruling.

Reconsideration is denied.

The case will proceed to sentencing.


I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Sergius Rinaldi, D.M.D., a dentist specializing in orthodontics, has practiced in Central Illinois for approximately 25 years,

1

with offices located in Springfield and Edwardsville, Illinois.  His clients have included wards of the State of Illinois under the protection of--or in the custody of--the Illinois Department of Children and Family Services("DCFS"), as well as those receiving Medicaid assistance from the Illinois Department of Public Aid ("IDPA").

This case has a lengthy procedural history.  On November 9, 2001, a thirteen-count indictment was returned against the Defendant.  On March 25, 2002, the Court accepted the Defendant's pleas of guilty to mail fraud (Count 1) and obstruction of a health care fraud investigation (Count 13). The Defendant has not been sentenced in this case.  On January 29, 2003, the Defendant filed a motion to withdraw his guilty pleas.  That motion was denied by the Court on February 27, 2003.  The Court reasoned that the Defendant had presented no fair and just reason which would require it to allow him to withdraw his guilty plea.

A. The Defendant's AADD Argument

On March 19, 2003, the Defendant filed a motion asking the Court to reconsider the Order and Opinion denying his motion to withdraw the

guilty plea.  While that motion was pending, the Defendant appealed the Court's April 10, 2003 Order committing  him to the custody of the Attorney General for a mental evaluation.  One of the bases on which the Defendant initially sought to withdraw his guilty plea is that he suffers from Adult Attention Deficit Disorder ("AADD"), and that the disorder prevented him from forming the requisite criminal intent at the time of the offenses.  In a report dated January 9, 2003, the Defendant was diagnosed by Robert Chapman, M.D., MBA, as having AADD.  Dr. Chapman opined that the Defendant's capacity to form criminal intent was diminished as a result of his AADD.  In a report dated January 28, 2004, George Athey, Jr., Ph.D., ABPP, also opined that the Defendant is "not capable of formulating and carrying out the intent to defraud with which he has been charged."[1]

The Court ordered an additional mental evaluation because of the Defendant's argument that he was unable to form the requisite criminal intent because of his AADD.  On May 5, 2003, the Defendant filed a notice of appeal from that Order directing him to submit to a custodial mental

_____

[1]The Defendant was referred by his attorney to Dr. Athey for a neuropsychological and psychological evaluation.

3

examination. This case was stayed while the Defendant's interlocutory appeal was pending. On December 1, 2003, the Seventh Circuit concluded that this Court's Order for a custodial mental evaluation of the Defendant was improper. However, the Seventh Circuit determined that the Court "may invite the defendant to consent to an outpatient examination." United States v. Rinaldi, 351 F.3d 285, 289 (7th Cir. 2003).

Following the remand from the Seventh Circuit, the Defendant was given one week to inform the Court whether he consented to an outpatient examination. The Defendant did consent to such an examination. Both the Defendant and the Government filed suggestions regarding the examination procedure. In an Order entered on March 11, 2004, the Court appointed Sue Moriearty, Ph.D., ABPP, to perform a psychological evaluation of the Defendant. Pursuant to the Government's request, the Court appointed Phillip E. Bornstein, M.D., FAPA, as an additional expert. The reports of Dr. Moriearty and Dr. Bornstein have been received by the Court. The parties have filed supplements to their briefs.

4

B. The Defendant's Billing Argument

The Defendant also seeks to withdraw his guilty plea on the basis that he was informed by the Government prior to the entry of the plea that IDPA, the agency which administers the Medicaid program in Illinois, only paid for orthodontic procedures on a "fee for service" basis, requiring the practitioner to actually perform the service that is billed. IDPA has established procedures to compensate orthodontists and other medical practitioners for services provided to Medicaid recipients. It also has certain rules and regulations which were published for providers in the Medicaid program. Dental providers were required to submit invoice forms to a company which administered the Medicaid program for dental services on behalf of IDPA. Prior to March 1, 1999, the entity was Delta Dental; after that date, it was Doral Dental. These companies, or carriers, had a contract with IDPA to administer claims for dental or orthodontic services. Claims for children who were wards of the State of Illinois or were otherwise under the jurisdiction, custody, or protection of the Illinois Department of Children and Family Services ("DCFS") were submitted to IDPA through

5

DCFS.

The Defendant contends that he committed no crime if a "bundled fee" procedure, instead of fee for service, was a permissible method of billing. He claims that if the proper billing procedure for orthodontia was a fee for service method, then he would be expected to see the client and provide a specific service on each date billed. If the practice and billing procedure for orthodontia is a bundled fee arrangement, however, then the bills would be sent monthly for what was going to be a "flat fee" for a specified number of months. These bills would be sent and the money owed by the Medicaid program whether the patient was actually in the office on that date or during the month.

The Defendant contends that prior to pleading guilty, he believed that he had correctly billed Medicaid under this bundled fee arrangement. In his motion to reconsider, the Defendant alleges that he and counsel were convinced by the Government that the Defense position regarding the propriety of the bundled fee procedure was incorrect as a matter of law. Moreover, the Defendant states he was informed by the Government that

it would provide the Defense with the "law" demonstrating that its position was correct.  The Defendant alleges the Government failed to provide the promised law confirming that IDPA paid on the basis of a fee for service. He claims it was only after the Government's failure to produce this information that he learned that IDPA paid for services with a bundled fee arrangement.  The Defendant contends the bundled fee arrangement allowed the orthodontist to bill monthly whether the service was actually performed that month or in fact performed multiple times during a given month.

The Defendant alleges that the plea is invalid both factually and legally.  Accordingly, he contends that he is seeking to withdraw the  pleas on the basis of actual innocence.

## II. ANALYSIS

### A. The Legal Standard

There is no absolute right to withdraw a guilty plea.  See United States v. Abdul, 75 F.3d 327, 329 (7th Cir. 1996).  A defendant may withdraw a guilty plea before a court imposes sentence if he meets his burden of

showing "a fair and just reason for requesting the withdrawal." See United States v. Bennett, 332 F.3d 1094, 1099 (7th Cir. 2003); Fed. R. Crim. P. 11(d)(2)(B). A defendant seeking to withdraw a guilty plea faces an "uphill battle" after a thorough Rule 11 colloquy. See Bennett, 332 F.3d at 1099.

B. The Defendant's AADD Diagnosis

The Defendant alleges it was not until well into the course of this litigation that the Defense team discovered his AADD problem. It was following a meeting with the Defendant when his attorneys, the investigator, and the Defense expert discussed the problems each encountered with the Defendant's lack of organization and ability to logically relate. A decision was then made to have the Defendant evaluated by a forensic psychiatrist. Based on Dr. Chapman's diagnosis of AADD, the Defendant contends that the Government cannot prove beyond a reasonable doubt that he possessed the requisite intent to commit the offenses to which he pled guilty.

The Defendant alleges the charges at issue are specific intent crimes and that inadvertent, negligent, or reckless actions fail to prove specific

intent.    Dr. Chapman found that an alternative explanation of the Defendant's behavior that the Government has identified as knowing criminal conduct is that it results from his "limited capacity to organize and follow through driven by impaired impulse control."  Dr. Chapman opined that this limited capacity, if true, would explain hiding documents and altering records.  He further determined that a diminished capacity to form criminal intent would apply to all of the charges and allegations of which he is aware.  Significantly however, Dr. Chapman found that the Defendant's limitations associated with AADD "did not rise to the level of incompetence to plead, stand trial, or proceed."  Moreover, Dr. Chapman concluded that there is no further "clinical evidence of any mental condition that substantially impaired [the Defendant's] competence" during the relevant period.

The Government notes that neither Dr. Moriearty nor Dr. Bornstein has found any cognitive dysfunction with the Defendant.  Dr. Moriearty found that the Defendant did not clearly meet the criteria for AADD or

Malingering.[2]  She opined that he functions within the average range when compared to other men nearing the age of 70.  Dr. Moriearty stated it would have been unlikely that she would have probed regarding an AADD diagnosis without the advance notice of that issue.  She further noted that the Defendant on several occasions gave answers about AADD symptoms which were "a bit too on target and revealed a perhaps suspiciously familiar acquaintance with [AADD] diagnostic criteria."  However, Dr. Moriearty emphasized that most adults have some symptoms which are consistent with AADD, but not to the extent that a formal diagnosis is warranted.

According to Dr. Moriearty, the presence of six or more out of eight symptoms of inattention that have persisted for at least six months to a degree that is "maladaptive and inconsistent with development level"

---

[2]Dr. Moriearty referred to the Defendant's alleged disorder as "Attention-deficit/hyperactivity disorder."  She states that is the current terminology used in the *Diagnostic and Statistical Manual of Disorders* (DSM-IV; American Psychiatric Association, 1994).  In the interest of consistency, the Court will continue referring to the Defendant's alleged condition as "AADD."

supports a diagnosis of AADD.[3]  The presence of six or more symptoms of

hyperactivity-impulsivity that have persisted at that level is also consistent

with such a diagnosis.[4]    Dr. Moriearty determined that some of the

Defendant's self-reported symptoms are probably true, but those symptoms

are not sufficiently severe to suggest that he currently meets the criteria for

an AADD diagnosis.[5]

---

[3]Dr. Moriearty noted the following symptoms of inattention: (1) often fails to give close attention to detail or makes careless mistakes; (2) often has difficulty sustaining attention in tasks; (3) often does not seem to listen when spoken to directly; (4) often does not follow through on instructions and fails to finish duties in the work place (not because of a failure to understand instructions); (5) often has difficulty organizing tasks; (6) often avoids, or dislikes, or is reluctant to engage in tasks that require sustained mental effort; (7) often loses things necessary for tasks; and (8) often is easily distracted by extraneous stimuli.

[4]The symptoms of hyperactivity include the following: (1) often fidgets with hands or feet or squirms in a seat; (2) often leaves seat when remaining in seat is expected; (3) often experiences feelings of restlessness; (4) often has difficulty quietly engaging in leisure activities; (5) often is "on the go" or acts as if "driven by a motor;" and (6)often talks excessively.  The symptoms of impulsivity include the following: (a) often blurting out answers before question has been completed; (b) often has difficulty awaiting turn; and (c) often interrupts or intrudes on others.

[5]Based on interviews with the Defendant and the Defendant's wife, Ronald E. Zek, PhD, determined that the Defendant meets the DSM-IV

Dr. Moriearty also considered whether the Defendant was malingering, or intentionally producing false or grossly exaggerated symptoms. She noted that because some exaggeration of information is expected in a legal context, there are those who believe that the AADD symptoms are too easily met. Dr. Moriearty determined that while there appeared to be some discrepancy between the Defendant's symptoms and her findings, it was not to the extent which would support a diagnosis of malingering.[6] Accordingly, she found that the Defendant did not meet the two criteria necessary for a DSM-IV diagnosis of malingering.

Dr. Moriearty opined that the Defendant's symptoms, even as

---

criteria for AADD. Dr. Zek further found that because of the symptoms of inattention, hyperactivity, and impulsivity associated with AADD, it "significantly contributed to the [Defendant's] disorganization at work with respect to his paperwork and his poor record keeping." The Defendant was referred by his attorney to Dr. Zek for a cognitive assessment for dementia.

[6]Malingering should be suspected if a person is referred by his attorney for an examination and one of the following factors is present: (1) significant discrepancy between the person's asserted stress or disability and the objective findings; (2) lack of cooperation during the evaluation and in complying with the prescribed treatment regimen; or (3) presence of antisocial personality disorder.

12

described and perhaps exaggerated by him, would not render him incompetent when applied to most legal standards. She further determined that he functions within the normal range on most tasks. Accordingly, Dr. Moriearty concluded that the Defendant does not clearly meet the criteria for AADD or malingering.

Dr. Bornstein also examined the Defendant to determine whether he suffers from any disorder which would interfere with his competence to: (1) stand trial; (2) enter into a plea negotiation; or (3) form the criminal intent to defraud. He determined that the Defendant has narcissistic personality disorder, which is defined as "[a] pervasive pattern of grandiosity (in fantasy or behavior), need for admiration, and lack of empathy, beginning by early adulthood and present in a variety of contexts."[7]   However, Dr. Bornstein

---

[7]The presence of five or more of the following factors supports a diagnosis of narcissistic personality disorder: (1) a grandiose sense of self-importance; (2) preoccupation with fantasies of unlimited success, power, brilliance, beauty or ideal love; (3) believes that he is "special" and unique and can only be understood by, or should associate with, other special or high-status people; (4) needs excessive admiration; (5) has a sense of entitlement; (6) takes advantage of others to achieve his own ends; (7) lacks empathy; (8) is often envious of others or believes that others are envious of him; and (9) exhibits arrogant, haughty behavior or attitudes.

13

stated that this personality disorder does not interfere with the Defendant's ability to form criminal intent to defraud, to cooperate fully with his attorney on his behalf, or to enter into plea negotiations or to plead guilty. Dr. Bornstein found that there is no evidence of any psychiatric disturbance which would interfere with the Defendant's ability to form the criminal intent to defraud or to understand the charges against him and cooperate fully and completely in his defense.

Dr. Bornstein further noted that during the relevant times, the Defendant was able to design and build a building for his own use. Moreover, the Defendant was able to practice orthodontia in two offices in a manner which he describes as "excellent and above average." Dr. Bornstein determined that the Defendant's intellectual capacity is clearly above average.

Dr. Bornstein further found that if the Defendant does have a mild cognitive disorder at this point in his life, it would more likely be due to some form of mild early dementia such as Alzheimer's. Significantly, neither a mild cognitive disorder nor AADD would interfere substantially

14

with the Defendant's intellectual functioning.  Dr. Bornstein determined, therefore, that these disorders are of no legal or clinical significance. Accordingly, he concluded that the Defendant is not precluded from forming the criminal intent to defraud because of any disorder.

The Defendant contends that each of his arguments involves a claim of actual innocence pursuant to United States v. Gomez-Orozco, 188 F.3d 422 (7th Cir. 1999),  and he should be allowed to withdraw his guilty plea on that basis.  In Gomez-Orozco, the Seventh Circuit considered the motion to withdraw a guilty plea to illegal re-entry by an alien.  Gomez-Orozco, 188 F.3d at 424.   The Seventh Circuit concluded that because there was substantial evidence tending to show that the defendant was an American citizen, his claim of legal innocence presented a fair and just reason as to why he should be allowed to withdraw his guilty plea.  See id. at 427.  For the reasons that follow, the Court concludes that the Defendant's AADD diagnosis did not prevent him from forming criminal intent.  Accordingly, he has not presented a claim of actual innocence as to that issue.

After carefully considering the reports which have been submitted and

15

the arguments of the parties, the Court is unable to conclude that the Defendant lacked the requisite intent, because of AADD or any other disorder, to commit the crimes of mail fraud or obstruction of a health care fraud investigation.  The Court agrees with the conclusions of Dr. Moriearty and Dr. Bornstein regarding the Defendant's competency and ability to form criminal intent.  The Court finds that it is particularly significant the Defendant was able to perform his tasks as an orthodontist in a manner that was, in his own words, "excellent and above average."   As Helen P. Appleton, PhD.,[8] observed, "It is incongruous that [the Defendant] could be so disabled by ADD or a Cognitive Disorder that he would be unable to form the intent to defraud, complete his paperwork, or bill properly while he was able to perform the full range of tasks required of an orthodontist." The Court finds this argument made by Dr. Appleton and others to be particularly persuasive.

The Court also observes that some of the symptoms associated with

---

[8]The Defendant was referred to Dr. Appleton for a psychological evaluation to be used in conjunction with Dr. Bornstein's psychiatric evaluation.

AADD, as suggested by Dr. Moriearty, are quite easily met.  The Court does not suggest that the Defendant was malingering.  However, it is evident from human experience that several of the symptoms of AADD are present in a relatively substantial percentage of the population.  The Court declines to hold that the presence of even a large number of these symptoms precludes an individual from forming the requisite intent to defraud.

Based on the foregoing, the Court concludes that the Defendant's alleged AADD did not interfere with his ability to form criminal intent.  Accordingly, the Defendant's motion to reconsider on that basis the Order and Opinion denying the motion to withdraw his guilty plea is DENIED.

### C.  The Defendant's Billing Argument

The Defendant also seeks to withdraw his guilty plea on the basis that the bundled fee procedure he used in billing Medicaid is not unlawful.  The Court's previous Order and Opinion denying the Defendant's motion to withdraw his guilty plea was based in part on its conclusion that the Defendant was aware of the information on which he based his argument at the time of the plea.  The Defendant notes that IDPA, "by rule, shall

17

determine the quantity and quality of and the rate of reimbursement for the medical assistance for which payment will be authorized . . . which may include . . . dental services." <u>See</u> 305 ILCS 5/5-5(10). The Defendant further alleges that the Illinois rules for dental services covered by IDPA do not address the quantity of follow-up visits required for orthodontics. <u>See</u> 89 Ill. Admin. Code §§ 140.420, 140.421.

In support of his motion to reconsider, the Defendant alleges that prior to the entry of the plea of guilty, he believed he had correctly billed Medicaid under a bundled fee arrangement. The Defendant's attorney raised that issue with counsel for the Government. The Defendant contends, however, that he was convinced by the Government that the Defense position was incorrect as a matter of law, and that the Government would provide the Defense with legal authority showing this to be the case. The Defendant asserts the Government has never provided the promised documentation that this case involved a fee for service. Moreover, he alleges the Defense was actively investigating the propriety of the bundled fee system; this investigation was abandoned based on the Government's

representation that it would provide the law supporting the indictment. The Defendant contends it was only after the Government failed to present the promised law that he took additional steps to evaluate the merits of the bundling claim.

The Defendant alleges that following the Government's failure to provide support that IDPA paid on the basis of a fee for service, he learned that it paid for services with a bundled fee arrangement. Accordingly, an orthodontist was allowed to bill monthly whether the service was actually performed that month or performed multiple times during a given month. The Defendant asserts that the Medicaid regulations create a bundled fee system. Consequently, the dates of service would not be material, and the claims submitted to IDPA for reimbursement cannot sustain a fraud conviction, given that they do not convey a material false statement. The Defendant asserts this is a claim of actual innocence pursuant to Gomez-Orozco, 188 F.3d at 427.

Relying on United States v. Mead, 533 U.S. 218, 234, 121 S. Ct. 2164, 2175 (2001), the Defendant asserts he cannot be found guilty of a

fraud count based on an agency interpretation of regulations or statutes. If a policy has not been subjected to formal rule making (such as agency rulings, interpretations contained in policy statements, agency manuals, and enforcement guidelines), it does not have the force of law. The Defendant's argument as to the billing procedure is based on a policy statement contained in the Dental Policy Clarification which was produced in discovery:

> Question 4: If the monies are not distributed fee for service, and the provider receives a prorated dollar amount as above, does the patient have to be seen monthly, etc?
>
> Response: The dentist can bill the monthly adjustments code #08670 whether he sees the patient or not. Monthly payment will be made for approved treatment as long as the client remains eligible and is in active treatment. Since these cases are severely medically necessary cases with excessive disfunctional [sic] problems, the dentist will usually have to see the client on a monthly basis just to adjust the braces as the teeth become aiigned [sic].

In support of his argument that he should be allowed to withdraw his guilty plea, the Defendant contends the Defense team has never received the law contradicting the policy statement noted above, which he alleges allows billing based on a bundled fee arrangement. The Defendant asserts the

20

Government has provided only the opinions of various individuals, and not

a regulation or statute.

In a letter to the Defendant's attorney regarding that memorandum,

counsel for the Government stated in pertinent part:

> [T]he Illinois Department of Public Aid has disavowed this
> memorandum and clarified that in all instances, IDPA would
> deny payment for any claim for orthodontia service when a child
> is not physically present to receive the service.  The 'final' word
> on that subject came from Steven Bradley, the head of the
> Bureau of Comprehensive Health Services for IDPA.  According
> to Mr. Bradley, that has always been the policy of IDPA and the
> author or page 1026 is simply wrong.

The letter containing the above passage is dated March 5, 2002; the

Defendant's plea of guilty was entered before the magistrate judge on the

same day and accepted by this Court approximately three weeks later.  A

letter dated June 21, 2002 from Government counsel to the Defendant's

attorney provides in pertinent part:

> I have enclosed section 103 of the IDPA provider manual which
> specifically provides that 'services and supplies for which
> payment will not be made include, but are not limited to. . .
> unkept appointments.'
>
> As you know, we disclosed a memorandum from a person
> at IDPA suggesting a contrary policy as it regards dentists (bates

21

number 1026) through the discovery process on or about February 21, 2002. We also discussed this specific document prior to the plea hearing on March 5, 2002, which resulted in my writing a letter dated that day clarifying what I understand the evidence would show. In that letter, it is stated that we received final word on the IDPA policy from Steven Bradley, the head of the Bureau of Comprehensive Health Services. I have asked Investigator Gilvey to determine if the word from Bradley was oral, or in writing. I will let you know when he gets back to me.

It is clear from the correspondence between the parties that the issue regarding the method by which IDPA paid was discussed by the parties contemporaneously with the entry of the plea.

The Defendant next contends that a charge of Medicaid fraud cannot be based on the violation of an informal policy that has not been formally adopted as a regulation. The Defendant claims this policy requiring patients to be physically present each month for the orthodontist to be eligible for the remaining payments exists only in correspondence from the U.S. Attorney's Office to counsel for the Defendant. Accordingly, it cannot form the basis for his guilty plea. The Defendant asserts that at the very least, his interpretation of what the rules required was a reasonable one.

The Government disputes the Defendant's assertion it had informed

him that it would provide counsel with some "law" demonstrating that IDPA employed a "fee for service" procedure. Rather, its letters to the Defendant's counsel were intended to confirm previous conversations and provide information that had been requested. The Government alleges the Defendant has produced no correspondence wherein he demanded, or the Government promised, any law in support of the plea. The Government also contends the Defendant has argued alternatively that he learned he was operating under a bundled fee billing procedure both before and after the entry of his guilty plea.

The Government also notes that the Defendant was indicted for, and pled guilty to, a massive scheme to defraud IDPA, wherein he submitted claims for orthodontic services provided to children which he did not actually provide. The Government claims that the indictment alleges a broad scheme which occurred over a seven-year period, and only certain examples in which checks were mailed to the Defendant in furtherance of the scheme are included. The Government further asserts that because the requirement that the mail need only be "in furtherance" of the scheme to

defraud is easily satisfied, it has not listed every fraudulent check or every fraudulent claim.

After carefully considering the argument of the parties and the entire record, the Court rejects the Defendant's argument that he was permitted to bill Medicaid for services not performed pursuant to a bundled fee arrangement.  It appears that the only basis for this argument is a policy statement found in a Dental Policy Clarification that has been disavowed, and of which the Defendant was aware at the time of the entry of the plea. The Defendant's argument is contradicted by the terms of the general handbook which was provided to individuals such as the Defendant who participated in the Illinois Medical Assistance Program.  And the Defendant signed a document agreeing to comply with the terms of that program.  This included an agreement "to bill the Department as stipulated in the applicable Medical Assistance Program Handbook(s)."  The handbook provides that dental services are covered.  Moreover, it provides that unkept appointments are not covered.  Accordingly, there would be no payment from IDPA unless the Defendant provided a service.

The Defendant argues that the general principles noted in the previous paragraph apply only to those who practice medicine, and not those who practice dentistry. While most of the chapters in the handbook are divided according to the provider's practice, the first section covers "[g]eneral policy and procedures applicable to all participating providers." The basis of the Defendant's argument, therefore, that these principles did not apply to him, is unclear. The terms forbidding payment for unkept appointments clearly apply to all providers.

It is also worth noting that there does not appear to be any support in the record for the Defendant's assertion that counsel for the Government promised to provide his attorney with "law" demonstrating that IDPA operated under a fee for service procedure. The Government alleges that the Defendant's assertion is "recklessly false and is completely contradicted by the correspondence he attached to the original motion." After carefully reviewing the documents attached to the Defendant's motion to withdraw and other portions of the record, the Court agrees that there do not appear to be any documents containing a promise from the Government to supply

25

the Defendant with legal authority concerning the billing issue. Perhaps the closest thing to such a promise is a passage from the June 21, 2002 letter, wherein counsel for the Government stated that he will inform the Defendant's attorney whether the word from Steven Bradley regarding the IDPA policy was oral or in writing. In the motion to withdraw his guilty plea, the Defendant states that he heard nothing more from the Government on that issue. However, this was not a promise to provide him with law supporting the indictment. There does not appear to be any evidence in the record supporting the Defendant's assertion that the Government promised to provide him with law demonstrating that IDPA utilized a fee for service procedure.

For the reasons herein given, it is clear that the IDPA does not pay for services with a bundled fee arrangement. Moreover, because the only statement indicating that it did pay in such a manner was provided to the Defendant before the entry of his guilty plea, there has been no change in circumstances which would justify allowing the Defendant to withdraw his guilty plea.

In its initial Order and Opinion denying the Defendant's motion to withdraw his guilty plea, the Court found that the Defendant had not presented a fair and just reason to justify allowing him to withdraw his guilty plea. Nor has the Defendant's motion to reconsider provided the Court with a basis to recede from its prior ruling. None of the Defendant's arguments involve a claim of actual innocence. Accordingly, the Court will DENY the Defendant's motion to reconsider the Order and Opinion denying his guilty plea.

## III. CONCLUSION

The Court finds no reason to depart from its earlier ruling denying the Defendant's motion to withdraw his guilty plea. Accordingly, the motion to reconsider that ruling is DENIED. This case will proceed to sentencing.

_Ergo_, the Defendant's motion for reconsideration of the Order and Opinion denying the motion to withdraw his plea of guilty is DENIED. The Defendant's sentencing hearing is hereby scheduled for April 25, 2005 at 2:30 p.m.

27

ENTER:  December 8, 2004

FOR THE COURT:

                                    s/Richard Mills
                                    United States District Judge