**E-FILED**
Tuesday, 23 August, 2005  02:10:46 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 01-30110 |
| v. | ) | |
| | ) | |
| SERGIUS RINALDI, | ) | |
| Defendant. | ) | |

MEMORANDUM IN SUPPORT OF
MOTION TO RECONSIDER ORDER OF DECEMBER 9, 2004

The defendant by and through counsel respectfully requests that the Court

reconsider the Order entered December 9, 2004 denying the defendant's request for an

order permitting the defendant to withdraw his plea of guilty.  The Defendant suggests

that the Court's decision was erroneous for the following reasons:

1.  Court erred in holding that Defendant had not presented substantial credible

evidence. The Defendant has presented credible evidence that he lacked the ability to

formulate criminal intent. The Defendant has presented credible evidence that

orthodontia is a pro rated system; that the Defendant did not receive §100; that the rules

and procedures are ambiguous to the degree that a conviction for fraud cannot be

supported; that the Defendant's interpretation of the IDPA rules and procedures as being

a pro rated system is reasonable and cannot support a conviction for fraud.

2.  The Court denied the materiality of the dates of service (pro rated benefit or

bundling[1]) argument of the Motion to Withdraw Plea and Motion to Reconsider based on

---

[1] The Defendant has previously termed the fee system as 'bundled'.  This appears to be less descriptive
than 'pro rata' and therefore will referred to hereinafter as 'pro rated benefit.

erroneous factual findings. These erroneous findings include the finding that Section 100 of the Provider's handbook prohibited payment for missed visits under all circumstances; that Bates 1026 was the only source for the Defendant's claim that he as an orthodontist could bill for missed appointments; and that Bates 1026 had been disavowed. The court was unaware that according to David Spinner Manager of Dental Programs for IDPA, IDPA did not provide section 100 of the Provider's Handbook to Dentists or Orthodontists during the indictment period.[2]

3. The Court erred by requiring the Defendant to meet a substantial evidence standard when the Seventh Circuit in *Gomez-Orozco* only required 'credible' evidence.

4. The Court erred by attempting to determine the ultimate decision of guilt or innocence. The *Gomez-Orozco* Court left the contested issue of guilt or innocence to the jury and merely determined that the Defendant had presented enough credible evidence to pass the issue on to a jury.

Instead of determining whether the Defendant had presented credible evidence to be permitted to withdraw his plea and have the issue go to the jury, this Court determined the ultimate issue against the Defendant. The Court determined the ultimate issue regarding the Defendant's ability to formulate criminal intent by choosing between competing medical evaluations. This choice should be made by the jury. The Court determined the ultimate question regarding the issue of fee for service vs. pro rata when the conflicting evidence of the type of fee system should be made by the jury.

---

[2] David Spinner's position is consistent with IDPA's FOIA response as to this issue. IDPA's FOIA response states that §100 was mailed to dentists prior to the indictment period. The later notices the IDPA response attaches did not relate to billing-just rate changes. Dave Spinner states that §100 was not sent to dentists during the indictment period. What was provided to dentists during the indictment period supports the pro rata claim. This is fully discussed at pages 13-24 hereafter. Exhibit 12.

5.  The Court erred by holding that the Defendant's claims were not "claims of actual innocence." As will hereinafter be discussed the Defendant's claims are claims of actual innocence.

## 1.  THE COURT'S ORDER OF DECEMBER 9, 2004

The Court in its December 9, 2004 opinion denied the Defendant's motion to reconsider.  The Court held that "Defendant's AADD diagnosis did not prevent him from formulating criminal intent."  Opinion, page 15.  Further the Court held; "[T]he Defendant's alleged AADD did not interfere with his ability to form criminal intent." Opinion at page 17.  On the billing argument, the Court denied the motion to withdraw finding: " It appears the only basis for this argument is a policy statement found in a Dental Policy Clarification that has been disavowed, and of which the Defendant was aware at the time of the entry of the plea.  The Defendant's argument is contradicted by the terms of the general handbook which was provided to individuals such as the Defendant who participated in the Illinois Medical Assistance Program."  The Court concluded: "The handbook provides that dental services are covered.  Moreover, it provides that unkept appointments are not covered.  Accordingly, there would be no payment from IDPA unless the Defendant provided a service."  Later the Court held: "[I]t is clear that the IDPA does not pay for services with a bundled fee arrangement."  The Court also determined that: "None of the Defendant's arguments involve a claim of actual innocence."

3

## 2.  THE LEGAL FRAMEWORK FOR A MOTION TO WITHDRAW A PLEA FILED BEFORE SENTENCING

There is no absolute right to withdraw a guilty plea.  *United States v. Abdul,* 75 F.3d 327, 329 (7th Cir. 1996).  A defendant may withdraw a guilty plea before a court imposes sentence if he meets his burden of showing a "fair and just reason for requesting the withdrawal." *United States v. Bennett,* 332 F.3d 1094, 1099 (7th Cir. 2003),  Fed. R. Crim. P. 11(d)(2)(b).  A claim of innocence is a fair and just reason to withdraw a plea.  However, a blanket claim of innocence does not mandate the court to allow a defendant to withdraw his plea.  The claim must be supported by credible evidence.  *United States v. Gomez-Orozco*, 188 F.3d 422, 425 (7th Cir. 1999)

A plea must be knowingly and willfully made. *United States v. Alvarez-Quiroga,* 901 F.2d 1433, 1437 (7th Cir. 1990).  A Defendant cannot enter a knowing plea unless his defenses have been thoroughly explored so that he understands what defense he is waiving by entering his plea.  Id.  See also *United States ex rel Rivera v. Franzen,* 794 F.2d 314, 317 (7th Cir. 1986), *cert denied,* 479 U.S. 991 (1986)

Dr. Rinaldi's admissions during the plea colloquy are not contrary to the following arguments and should not be a basis to deny permission for him to withdraw his plea.  Dr. Rinaldi's admission at the plea colloquy that he billed for monthly adjustments on dates when he did not see the patient are consistent with the policy clarification.  Since materiality is an essential element of the crime of mail fraud, those admissions did not satisfy the requisite elements of mail fraud.  Like the Defendant in *United States v. Barboa*, 777 F.2d 1420 (10th Cir. 1985), if Dr. Rinaldi thought his conduct constituted a crime, but he pled guilty to something that is not a crime, he should

4

not now be precluded from raising a defense that goes to the government's power to bring him into court.

Rinaldi's plea of guilty was entered without being aware that his mental health provided a defense to the obstruction count as well as the billing count.

### 3.  BASIS FOR WITHDRAWAL OF PLEA

1. It is fair and just for the plea to be withdrawn because the defendant's mental condition prevented him from forming the requisite criminal intent to commit both the crimes as alleged.  This is a claim of actual innocence.

2. It is fair and just for the plea to be withdrawn because no crime was committed. This is a claim of actual innocence

a. The defense has learned David Spinner, Manager of the Dental Program, IDPA, authored the Policy Clarification.  Exhibit 1.  The policy clarification is consistent with the carrier and provider manuals (see pages 17-23) and a correct statement of policy for the indictment period.  Dr. Rinaldi's billing was consistent with the manuals and in conformance with IDPA policy and therefore is not a crime.  The Defendant has set forth a fair and just reason to withdraw his guilty plea on that basis alone.  It also has been learned by the Defense from interviews with Dave Spinner that Dentists did not receive section 100 of the Provider's handbook.  Exhibit 1 page 8.  See, footnote 2

b. The policies, practices and regulations are ambiguous to such an extent they cannot serve as the basis of criminal liability without violating due process of law. "A criminal statute must, if it is to comport with the requirements of due process, give fair notice of its prohibitions to those persons potentially subject to it.  The primary purpose

of this doctrine as articulated in the modern cases is the realistic one of limiting prosecutorial discretion rather than the unrealistic one of protecting the reliance of people--for there are precious few--who actually read statutes, criminal or otherwise, before deciding whether to do something. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Waldron v. McAtee,* 723 F.2d 1348, 1354 (7th Cir.1983); *United States v. White,* 882 F.2d 250, 252 (7th Cir.1989)." *Kucharek v. Hanaway,* 902 F.2d 513, 518 (7th Cir. 1990).

    c.  Dr. Rinaldi's interpretation of the Byzantine array of policies and regulations is not clearly unreasonable and therefore there is no intent to defraud.  In addition to the defense that the services were pro rata and claims for monthly adjustments were not fraud, these same arguments go to the question of intent.  Dr. Rinaldi set forth arguments in the Motion to Withdraw that because he had a reasonable interpretation of IDPA policies, he therefore could not have the requisite intent to commit fraud as a matter of law, *U.S. v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002).  Further, materiality is an essential element of the crime of mail fraud.  See *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).  If the government does not negate a contractor's reasonable interpretation, which would make the contractor's statements correct, there is insufficient evidence to support false claims liability.  *U.S. v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978)

***DISCUSSION***

1. COURT ERRED IN FINDING THAT DEFENDANT HAD NOT PRESENTED
SUBSTANTIAL CREDIBLE EVIDENCE.

THE DIMINISHED CAPACITY/CRIMINAL INTENT CLAIM

Through the medical reports and evaluation of Dr. Athey, Dr. Chapman and Dr.
Zec the defendant has presented credible medical opinion and evidence to support his
position. With respect to the medical condition the defendant has suggested that he has a
defense to the fraud and obstruction charges. The defense is that the defendant's mental
condition prevented him from forming the requisite criminal intent to commit both the
crimes as alleged. This is a claim of legal innocence.

1. Robert E. Chapman, M.D.,S.C. is a Diplomate of the American Board of Psychiatry
and Neurology, Diplomate of the American Board of Forensic Psychiatry and a Fellow of
the American College of Forensic Psychiatry. Dr. Chapman submitted a report dated
January 9, 2003 (part of the record). Dr. Chapman identified the hundreds of pages of
discovery and the indictment he reviewed to identify the allegations of criminal behavior
lodged against the defendant. Dr. Chapman also identified his interviews with the
defendant and the defendant's wife. Dr. Chapman administered the Minnesota
Multiphasic Personality Inventory-2. (MMPI-2). Dr. Chapman noted the admission of
the defendant that the defendant had difficulty getting organized, chronic procrastination,
trouble getting started and the fact that the defendant had many projects going
simultaneously having trouble with follow-through. Dr. Chapman diagnosed the
defendant with AADD. Dr. Chapman concluded that an alternative explanation to
knowing criminal behavior would be that the behavior flows from the defendant's limited

capacity to organize and follow-through driven by impaired impulse control. Dr. Chapman opined that the latter would explain hiding documents and altering records, if true. Dr. Chapman concluded that the defendant's capacity to form criminal intent is diminished as the result of AADD and that this lack of capacity would apply to all of the charges and allegations Dr. Chapman reviewed.

2. George Athey, Jr., Ph.D., ABPP. From 1974-2001 Dr. Athey served the Menninger Clinic, Topeka, Kansas as a Clinical Psychologist and Neuropsychologist. Since leaving the Menninger Clinic Dr. Athey has been a Partner with the Heritage Mental Health Clinic in Topeka, Kansas working in the areas of Clinical Psychology, Neuropsychology and Forensic Psychology. Dr. Athey's report dated October 12, 2003 has been filed with this Court. Dr. Athey submitted his opinion within a reasonable degree of psychological and neuropsychological certainty that the defendant was not capable of formulating and carrying out the intent to defraud with which he was charged.[3] Dr. Athey conducted an extensive examination of the defendant from September 17, 2003 to September 19, 2003. Dr. Athey ordered a social history and stressors, which was conducted by Mr. Renee Rodgers, LCSW of the Heritage Clinic. Dr. Athey ruled out malingering and found no antisocial personality characteristics. Antisocial personality characteristics would

---

[3] Dr. Athey and Dr. Zec who also provided a report to the Court are the only evaluators trained in neuropsychology. None of the examiners for the Court or Government have this training.

8

suggest a proneness to exploit others for personal gain.[4] Dr. Athey performed extensive psychological and neuropsychological testing. Dr. Athey found the defendant's functioning indicative of brain-based deficits. Dr. Athey found no psychiatric disorder that would produce the pattern of neuropsychological deficits. As a diagnostic assignment Dr. Athey found Cognitive Disorder (not otherwise specified) and a history of Attention Deficit/ Hyperactivity Disorder, Combined Type, adult residual. Dr. Athey recommended a full-scale brain imaging protocol to assess the integrity of the brain structure and integrity of brain metabolism and circulation.

3. The brain imaging was conducted by the Hoglund Brain Imaging Center at the University of Kansas Medical Center. The report dated March 1, 2004 has been submitted to the Court. The Impression from this report suggested mild to moderate cerebral atrophy and mild paraventricular white matter disease. While nonspecific, the white matter disease is likely related to chronic small vessel ischemia. The report noted that behavioral testing of attentional and executive function/decision processes revealed evidence of impaired processing. However, physiological data was not explicitly indicative of adult ADD as the source of the impairments.

4. Ronald F. Zec, Ph.D., ABPN, ABPP(CN) provided reports to the Court dated June 21, 2004 and July 2, 2004. Dr. Zec is an Associate Professor in the Department of Psychiatry and Neurology at the Southern Illinois University (SIU) Center for Alzheimer Disease and Related Disorders at Southern Illinois University School of Medicine in Springfield,

---

[4] No evaluator either for the defense, Government or Court found malingering or antisocial personality.

Illinois.  Dr. Zec is a Diplomate from the American Board of Clinical Neuropsychology

(ABCN) and the American Board of Professional Psychology (ABPP) as well as a

Diplomate from the American Board of Professional Neuropsychology  (ABPN).  Dr.

Zec concluded that the defendant likely has had some mild cognitive decline perhaps

attributed to chronic small vessel ischemia interacting with the effects of suspected

lifelong ADHD.  If pre-morbid IQ is assumed to be average Dr. Zec does not see

evidence of progressive dementia.  Dr. Zec reviewed the neurological testing of Dr.

Athey and additionally performed his own set of neurological tests.  Dr. Zec found that

the defendant did meet the DSM-1V criteria for ADHD.  Dr. Zec stated that it was his

opinion that the defendant's ADHD with its symptoms of inattention, hyperactivity, and

impulsivity significantly contributed to the defendant's disorganization at work with

respect to his paperwork and his poor record keeping.

5. Dr. Sue Moriearty, Ph.D., ABPP-F was appointed by the Court to perform an

evaluation of the Defendant. This report has been filed with the Court. Dr. Moriearty

understood her evaluation to include: "The Defendant claims that he suffers (or did

suffer) from adult attention disorder.  The Government asserts that the Defendant's

claims are false and that he is malingering.  Dr. Moriearty will examine the Defendant to

determine the validity of his claim and the claims of the Government".  It was Dr.

Moreiarty's opinion that the Defendant did not clearly meet the criteria for ADHD or

malingering.  Dr. Moriearty listed the criteria for ADHD in the categories of inattention,

hyperactivity and impulsivity.  The report does not list which criteria the Defendant met

or did not meet but concluded in a global sense that the Defendant did not meet the

necessary criteria.  Dr. Moriearty noted the report of Dr. Chapman but found it

unconvincing. Dr. Moriearty noted the report of Dr. Athey but concluded that Dr. Athey had assumed higher than average pre-morbid IQ to reach some of his conclusion, which Dr. Moriearty suggested was incorrect. Dr. Moriearty listed the criteria for malingering found in the DSM-IV. Unlike Dr. Moriearty's failure to analyze the criteria for ADHD Dr. Moriearty did analyze the criteria for malingering as it applied to the Defendant and did not find malingering. With respect to competence, Dr. Moriearty concluded that even if the Defendant's IQ had dropped from 130 to 100 that it would be of no consequence because a person with an IQ of 100 would be competent. Two neurologists, Dr. Athey and Dr. Zec, seriously dispute the consequence of such a drop in IQ. Dr. Moriearty did in fact find deficits with respect to the Defendant's functioning but did not explain them: "The Defendant however does function within the normal range on most tasks and even on those tasks where his abilities are more limited it should be possible to make accommodations for his deficits". Dr. Moreiarty fails to explain what deficits exist and what accommodations would be required. Dr. Moriearty did not have the benefit of Dr. Zec's evaluation.

6. Helen P. Appleton, Ph.D. examined the Defendant. (report filed with the Court). Dr. Appleton identified that she had been asked for a second opinion; that a psychiatrist and neuropsychologist had evaluated the Defendant and concluded that he had diminished capacity to formulate criminal intent to defraud the Government and to obstruct justice due to AADD or cognitive disorder, not otherwise specified. While recognizing that she lacked the expertise to evaluate the specialty tests administered by Dr. Athey, Dr. Appleton suggested that Dr. Athey's test results underestimated the Defendant's abilities and suggested repeat testing performed by a general Clinical Psychologist should be

accomplished if rebuttal was needed.  Essentially Dr. Appleton's opinion was based on

the idea that she found it incongruous that the Defendant could be so disabled by ADD or

a Cognitive Disorder that he would be unable to form criminal intent to defraud,

complete his paperwork, or bill properly while he was able to perform the full range of

tasks required of an orthodontist.  Dr. Appleton's opinion was that the Defendant did

have the mental capacity to submit fraudulent billing and to form the intent to do so and

that the Defendant had the capacity to form the intent to obstruct justice by placing

certain papers in a location where they would not be readily discovered in anticipation of

the search warrant.

7. Phillip E. Bornstein, M.D., Forensic Psychiatry evaluated the Defendant.(report filed

with the Court).  Dr. Bornstein does not dispute the diagnosis of Attention Deficit

Disorder or cognitive disorder not otherwise specified.  Dr. Bornstein finds that

regardless of whether Defendant has a mild cognitive disorder or ADD "it must be noted

that neither of these disorders rise to the level of their ability to interfere substantially

with his intellectual functioning".  Dr. Bornstein noted "even if these disorders were

present, these disorders are on no legal or clinical significance".  Like Dr. Appleton, Dr.

Bornstein believed that because during the times in question Defendant was able to

practice orthodontia in two offices and was able to help design and build a building for

his own use that he was therefore able to formulate criminal intent to defraud and

obstruct justice.  Actually as will hereinafter be discussed this basis as used by Dr.

Appleton and Dr Bornstein does not support the conclusions reached by Dr. Appleton or

Dr. Bornstein.

8.  Dr. Robert Chapman, M.D., S.C. has prepared an updated report, attached as Exhibit number 2.  Dr. Chapman notes that every expert evaluating the defendant has found some mental health issue impacting the Defendant, Rinaldi.  The disagreement between the experts is the extent and nature of the mental health problems and the impact of those problems on Rinaldi's ability to formulate criminal intent to commit fraud or obstruct justice.  Dr. Chapman also addresses the issue of how a person such as the Defendant can appear to be functioning normally, e.g. practicing the tasks directly related to the mechanical portion of orthodontia but yet cannot keep records or organize his practice as to the other parts of an orthodontic practice.  Dr. Chapman, whose practice has seen other surgical type experts with AADD states that it is not unusual for such people to be quite skilled in the mechanic aspects of medicine, but at the same time be completely unable to organize the other aspects of their practices.  Dr. Chapman also notes that there is some question as to the meaning, in a psychiatric, sense Rinaldi's involvement in the design and building of the office building that other experts and the Court found significant.  Dr. Chapman opines that Dr. Rinaldi does have mental deficiencies such that he could not form criminal intent to defraud.

This synopsis shows that the defendant's evidence of actual innocence due to diminished capacity is credible and substantial.

## THE BILLING CLAIM

A.  THE DEFENDANT HAS ALSO PRESENTED SUBSTANTIAL CREDIBLE EVIDENCE THAT THE DATE OF SERVICE ON THE CLAIM FORMS IS NOT A FALSE STATEMENT MATERIAL TO WHETHER IDPA WOULD PAY THE CLAIM.

The Court denied the materiality of the dates of service portion of the Motion to withdraw Plea and motion to reconsider based on its findings that the Provider's Handbook, section 100 disallowed payments for missed visits: that document bates stamped 1026 was the only evidence that the defense had substantiating the Defendant's billing practices; and that 1026 had been disavowed.  These findings are factually erroneous.

A.    DENTISTS DID NOT RECEIVE SECTION 100 OF THE PROVIDER'S HANDBOOK DURING THE INDICTMENT PERIOD, THUS SECTION 100 CAN NOT BE RELIED ON AS SERVING NOTICE ON THE DEFENDANT THAT IDPA WOULD NOT PAY FOR MISSED APPOINTMENTS.

DAVE SPINNER

David Spinner the Manager of the IDPA Dental Policy Program and the author of 1026 has stated to the investigator for the defense that Dentists did not receive section 100 of the Provider's Handbook as that was for medical providers.  Spinner stated in his April 27, 2005 meeting that Dentists receive DORM (Dental Office Reference Manual) and that it contains "dental information only". Exhibit 1 page 7.  This would indicate that Dentists only receive excerpts of the manual, not the entire manual.  In the same interview Spinner stated; "No, the 100 only goes to medical providers.  I think possible a few may do surgical procedures also, so they would get both 100 and 200 they are separate manuals, not bound together.  There is no reason that a dentist or orthodontist gets the medical manual otherwise.  As I said they are different manuals."  Exhibit 1 page number 8.  Therefore the Court cannot rely on Section 100 as notice to Rinaldi of the policy that he could not bill for missed appointments.

14

FOIA MATERIAL EXHIBIT 12

There is a conflict between the medical policy in §100 and the dental policies adopted by IDPA in the Carrier and Provider manuals. The Carrier and Provider manuals were sent to dentists. Exhibit 12 (FOIA material received from IDPA in August 2005) is consistent with Mr. Spinner's position. (Paginated by defense with pages 1-200). Dave Spinner is the Manager of the Dental program and has been with IDPA for many years. Dave Spinner is in a position to know who receives §100 and other manuals. Dave Spinner reported that he had no knowledge of medical benefits or how they were billed or paid. Exhibit 1. Dave Spinner, manager of the dental program reported in exhibit 1 page 8 that dentists DO NOT receive §100 unless they also perform medical procedures. (see exhibit 12 page 152 stating that dentists who do medical procedures must re enroll--- Rinaldi did not fit this category and did not re enroll for medical procedures). During the indictment period dental providers received the Delta/Doral manuals for instructions on billing and not §100. As hereinafter discussed the Delta/Doral manuals as well as CDT codes did not prohibit billing for missed appointments. Dentists during the indictment period did not receive §100 and the section did not apply to orthodontists. Certainly orthodontists during the indictment period did not receive fair notice that the later Delta/Doral manuals contradicting the missed appointment exclusion in §100 were in dispute. IDPA paying for missed appointments in orthodontia was the rule until the 2003 "Rinaldi Fix" rules were adopted as discussed hereinafter. Dentists were only referred to section 100 in the 2005 Rinaldi fix as discussed hereinafter.

Nor does exhibit 12 provide sufficient evidence to hold the Defendant accountable for receiving §100 prior to the indictment period in 1992 or prove that

missed appointments are not paid for orthodontia. Dave Spinner in exhibit 1 page 8 reported that IDPA only pays when service is provided but in the same exhibit reports that IDPA does pay for two missed appointments (service obviously not provided). Spinner reported that the idea was that after missing two visits the clients usually don't return. Mr. Spinner also stated in Exhibit 1 page 6: "After the initial consult, installation and such, the monthly adjustments are pro rated". With respect to the Defendant Mr. Spinner reported that while the Government wanted to go after Rinaldi for all missed visits that IDPA stuck to their policy for paying for two missed appointments. Exhibit 1 page 8.

Exhibit 12 is confusing and contradictory. At page 4 of exhibit 12 IDPA responds by stating that they pay for orthodontic CDT code D8670 but do not pro-rate reimbursement. Yet as will hereinafter be discussed CDT code D8670 is a pro rated code. At page 4 of exhibit 12 IDPA responds by citing the code listing services not covered which includes "missed appointment". The entire list is medical and not dental procedures. Orthodontia is not included. Orthodontia is found in §200 and is controlled by the 1994-2001 Delta/Doral manuals and Dental CDT codes. D8670 is pro rated and the 1994-2001 Delta/Doral manuals instructing orthodontists on billing permit payment for missed appointments.

REFUSAL OF IDPA TO PROVIDE INFORMATION ON 1026.

At page 6 of exhibit 12 IDPA responds by stating that 1026 was a "draft" policy, never distributed and there was no reason to disavow. This directly conflicts with the statements of Dave Spinner. In exhibit 1 pages 5-6 Dave Spinner reported that 1026 was a policy clarification for auditors who were confused (not a draft) and that the policy was

changed in April 2000 by Mr. Bradley and Doral. It is this record of change that the

defense has sought through FOIA procedures. To date IDPA has refused to provide any

records related to this document, its adoption or disavowance and the matter is on FOIA

appeal See letter dated August 19, 2005 from Amy S. Leopard, attorney to Illinois

Department of Healthcare and Family Services, Exhibit 2A.

In response to the FOIA request as to what persons received §100 IDPA at page 7

of exhibit 12 reported that it was sent to all enrolled Medical Assistance Providers in

October of 1992. IDPA further responded by stating that additional notices were sent to

dentists on the dates listed. The notices in exhibit 12 pages 147-158 only provide

information on rate changes. IDPA did not provide evidence that the Defendant actually

received the documents though evidence of this was requested through the FOIA.

Moreover, §100 if delivered (which is contested) was a document dated in 1992

which is prior to the indictment period. IDPA in response to FOIA requests provided the

criteria manuals and office reference manuals during the period of the indictment from

1994. As hereinafter discussed at pages pages 18-23 these manuals provided for payment

for two missed appointments. This contradicts the exclusion in §100 regarding payment

for unkept appointments and supercedes §100.

THE MARCH 5, 2002 LETTER FROM MR. HANSEN TO MR. COSTELLO

TO INDUCE THE PLEA OF GUILTY IS REFUTED AND INCORRECT.

The March 5, 2002 stated that IDPA would "deny payment for any claim for

orthodontia service when a child is not physically present to receive the service". The

manuals as confirmed by Mr. Spinner DO PERMIT payment for missed appointments.

The Rinaldi fix was not instituted until well after the indictment period in 2003. See page 20 following. The history and provision for pro rated payments in the CDT codes refutes and supercedes §100. See pages 22-23 following. That §100 applies to medical and not dental finds support at page 152 of exhibit 12. The Department determined that for a dentist to be reimbursed for medical procedures (limited as set forth at page 152) the dentist had to re enroll in the Medical Assistance program which the Defendant did not do. The Defendant does none of the procedures listed on page 152. THE DEFENDANT IS NOT A MEDICAL DOCTOR.

This morass of confusion created by IDPA should be fleshed out and presented to the jury for determination.

B. THERE ARE SEVERAL OTHER REGULATIONS OR POLICY STATEMENTS BEYOND THE POLICY CLARIFICATION, THAT IDPA WOULD PAY FOR MISSED APPOINTMENTS.

The Court at page 24 of its December 9, 2004 Opinion held that: "it appears that the only basis for this argument that he was permitted to bill Medicaid is a policy statement found in a Dental Policy Clarification that has been disavowed…" The Carrier manuals[5] contradict the absolute statement that IDPA would never pay for a missed appointment. The Carrier manuals for the indictment period had an 'active treatment' rule that permitted an orthodontist to bill for at least two consecutive missed appointments. In an interview with Mr. David Spinner, IDPA Manager of Dental Programs on April 27, 2005, Spinner was asked, "Does an orthodontist get paid for the two missed visits we talked about in our previous meeting?" Spinner answered, "Yes,

---

[5] According to IDPA's August 5, 2005 response to a FOIA request, "The Dental Office Reference Manuals are sent to all dental providers enrolled in the Medical Assistance program as reflected in the Department's provider database on that particular mailing date." Until 2005 no guidance was provided to Dentists as to which book controlled if there was a conflict like this between the 'manual' and the 'handbook' Exhibit 7. A dentist would logically understand that section 200 and the dental manuals and CDT codes would apply to dental billing while section 100 was for medical procedures.

they would get paid, but after missing two visits the provider has to contact IDPA, Delta, or Doral whichever was processing the claim.  Our thought on that is if they miss more than two they usually don't come back.  The Government wanted to go after Rinaldi for billing more than that but we adamantly stuck to the policy for payment for two missed visits".  Exhibit 1.

The Carrier Manuals in effect during the indictment period contradict the holding that IDPA would never pay for missed appointments.  The Carrier manuals had an active treatment rule that allowed Dentists to be paid for two missed appointments in spite of Section 103 of the Provider's Handbook.  Carrier Manuals are the directions provided to the bill processing personnel at Delta Dental or Doral for processing claims. The manuals are adopted by IDPA. The manuals are the Bible according to Mr. Spinner.  Exhibit 1 page 4. While Delta Dental was running things the carrier manual was entitled; "Criteria Manual for the Illinois Public Aid Dental Program."  Exhibit 3.  When Doral Dental took over it was entitled: "Doral Office Reference Manual".  Exhibits 4 – 7.

**Nov. 1994 Delta "Criteria Manual for the Illinois Public Aid Dental Program**

a. Page. 22, Paragraph 3.  Billing Submittal for Comprehensive Orthodontic Treatment:
When pre-authorization is given…
Billing for each month of treatment (code 08002) is to be submitted following treatment and payment is made for the month of service regardless of the number of times the patient may be seen in the office during any one month.  Payment will be made for the approved treatment only as long as the patient remains eligible for assistance and is in active treatment.

b. Paragraph 4: Failure to Keep Appointments:
If the patient fails to keep two monthly appointments, subsequent billings are not to be submitted until the patient is again in active treatment.  If the orthodontist is unable to obtain the patient's cooperation in keeping subsequent appointments, he/she

19

is to notify the local Public Aid office for the caseworker's assistance in obtaining this cooperation.  (Exhibit 3)

**2-20-1999, 7-9-1999, and 1-7-2001 Doral Office Reference Manuals.**

a. Page 28 of the 2-20-1999 Doral Office Reference Manual; Page 28 of the 7-9-1999 Doral Office Manual, page 29 of the 1-7-2001 Doral Office Manual:
To initiate payment on an approved comprehensive orthodontic case, the dental office needs to submit a claim form indicating the date the appliances were placed (banding date).  Monthly payments will be made for approved treatment as long as the Client remains eligible and is in active treatment.  A Client will not be considered to be in active treatment if they have failed to keep appointments in two consecutive months.  If a Client fails to keep an appointment for two consecutive months, the dental office must notify Doral. (Exhibit 4)

b. Pg. 29 of the 2-20-1999 Doral Office Reference Manual; Page 29 of the 7-9-1999 Doral Office Manual: Page 30 of the 1-7-2001 Doral Office Manual (From Chart):
D08670 Monthly Adjustments /2-20 /completed claim form /yes /maximum of one per month regardless of number of visits each month (Exhibit 4)

**2-7-2001 Doral Office Reference Manual**

a. Pg. 33
To initiate payment on an approved comprehensive orthodontic case, the dental office needs to submit a claim form indicating the date appliances were placed (banding date).  Monthly payments will be made for approved treatment as long as the Client remains eligible and is in active treatment.  In order to receive reimbursement for monthly adjustments, provider must bill for the date of service treatment was rendered.  A Client will not be considered to be in active treatment if they have failed to keep appointments in two consecutive months.  If a Client fails to keep an appointment for two consecutive months, the dental office must notify Doral.  (Exhibit 5)

b.  Page 34 same as 1999  (Exhibit 5)

**2003 Doral Office Reference Manual**

a. Page. 41
To initiate payment on an approved comprehensive orthodontic case, the dental office needs to submit a claim form indicating the date the appliances were placed (banding date). Monthly payments will be made for approved treatment as long as the Client remains eligible and is in active treatment.  IN ORDER

20

TO RECEIVE REIMBURSEMENT OR MONTHLY
ADJUSTMENTS, PROVIDER MUST BILL FOR THE DATE OF
SERVICE TREATMENT WAS RENDERED.  A Client will not
be considered to be in active treatment if they have failed to keep
appointments in two consecutive months.  If a Client fails to keep
an appointment for two consecutive months, the dental office must
notify Doral.  (Exhibit 6)

b. Page 42 Same as before except no documentation
required (blank)  (Exhibit 6)

### 1-3-2005 Doral Office Reference Manual
a. page. 9  Paragraph 1.02  The Department's *Handbook for Providers of Medical Services* is available for your review at…  Please refer to Chapter 100 (General Policy and procedures, provider information necessary for providers to receive payment from the Department).  If you do not have access to the Internet, please call 217.782.0538 or 217.524.7306 to request a copy of the handbook.  (Exhibit 7)
b.  Page. 45
To initiate payment on an approved comprehensive orthodontic case, the dental office needs to submit a claim form indicating the date the appliances were placed (banding date).  Monthly payments will be made for approved treatment as long as the Client remains eligible and is in active treatment.  IN ORDER TO RECEIVE REIMBURSEMENT OR MONTHLY ADJUSTMENTS, PROVIDER MUST BILL FOR THE DATE OF SERVICE TREATMENT WAS RENDERED.  A Client will not be considered to be in active treatment if they have failed to keep appointments in two consecutive months.  If a Client fails to keep an appointment for two consecutive months, the dental office must notify Doral.  (Exhibit 7)

These excerpts show that an orthodontist could legitimately bill for at least two

(2) consecutive missed appointments and not commit criminal fraud.  They also indicate

that the Handbook is not the final word on payment policy, contrary to the Court's

finding.  The 'active treatment' rule also contradicts the finding that IDPA would not pay

for missed appointments. Moreover they demonstrate that the carriers IDPA contracted

with to assess claims and implement policies held the same understanding as the

Defendant. The Defendant's interpretation therefore is reasonable and the Defendant did

not have the requisite intent to commit fraud as a matter of law.

The 2003 and 2005 changes, the 'Rinaldi fix' were made by IDPA in response to Rinaldi's case.  They are significant in that they show that only after 2005 did the Office Reference Manual refer to the Section 100 of Provider handbook.  When asked about changes to the manual in his April 26, 2005 interview with the investigator for the defense, Spinner stated: "Oh yes, there are changes made every year.  Especially after, I believe 2003, after the Rinaldi incident."  (Exhibit 1 page7).

ORTHONDONTIA IS HISTORICALLY A PRO RATED BENEFIT

Another source for the pro rata billing system comes from other payors.  Orthodontists typically and historically bill patients a pro rata fee for the monthly adjustments occurring after the initial placement of the braces.  Other insurance carriers, including TRICARE, the successor to CHAMPUS which provides medical and dental coverage to Military personnel and their families, treat the adjustment period as pro rata, and pays the monthly pro rata fee even if the patient is not seen that particular month.  Other insurance companies treat this in the same manner.  (Exhibit 8)

ADA/CDT CLAIM FORMS STATE PRORATED

Another source of the pro rata system is from the actual wording on the claim forms required by IDPA and created by the American Dental Association.  Dentists and Orthodontists bill patients, insurance companies and others by using a system entitled "Current Dental Terminology" or more commonly known as the 'CDT' codes.  (Exhibit 9)  According to the Preface of the CDT code manual CDT codes were created to "assist dental staff in accurately reporting treatment provided by dentists to patients."  The indictment period in this case runs from 1994 to 2001.  The CDT codes were reissued several times during the indictment period.  The 2nd Edition of the codes (CDT–2) was

22

issued in 1994.  Page 40 explains that code 08670 is for "periodic orthodontic treatment visit (as part of contract.)  At page 105 the CDT-2 Manual explains that when the Orthodontist files a claim using the American Dental Association claim form: if the treatment is for Orthodontics "when orthodontics are covered, the dates and months of treatment remaining will affect the ***prorated*** monthly reimbursement made to the dentist." (emphasis added.)CDT-3 was issued in 1999.  The service described by code 08670 did not change, except it became a 'D" code, so it was now D8670 instead of 08670.  See CDT-3 pg 47.  At page 97 and 100 of CDT-3 it is stated that box 54 of the claim form asks whether the claim is for orthodontics and if service already commenced, date appliances placed and total months of treatment remaining.  The explanation of box 54 is that if the treatment is for orthodontics, the date the appliances were placed and the number of months remaining is "necessary to determine the ***prorated*** benefit."  CDT-4 was issued 2002, the description of code D8670 did not change.  See CDT-4 pg81.  Box 40 on the claim form asks the same questions, ie is the claim for orthodontic services and if so the date the appliances were placed (Box 41) and the number of months of treatment remaining. (Box 42).  The explanation of the claim form makes no specific mention of these boxes.  (Exhibit 9). IDPA RELIES ON THE ADA/CDT CODES. IDPA works closely with the American Dental Association to develop coding for dentists and thereafter use those codes for benefit application and the ADA claim forms for billing. Exhibit 12, pages 95 and 101.

   c.  IDPA's INTERNAL HANDLING OF THE CLAIMS REFLECTS THAT THE DATE OF SERVICE WAS NOT MATERIAL TO THE PROCESSING OF ORTHODONTIST'S CLAIMS.

   The review of the discovery and subsequent investigation reveals that while IDPA was processing Rinaldi's claims it was not uncommon for IDPA claims processing

personnel to 'white out' dates of service and insert fictitious dates that IDPA created. Exhibit 10). Paginated by defense pages 1-45.  This practice evidences that the date of service was not a material factor in IDPA's decision to pay Rinaldi's claims and therefore the dates of service were not a materially false statement to support the fraud conviction.

  D.  THE POLICY CLARIFICATION HAS NOT BEEN 'DISAVOWED'.

  The Court at page 24 of its December 9, 2004 Opinion held that: "it appears that the only basis for this argument that he was permitted to bill Medicaid is a policy statement found in a Dental Policy Clarification that has been disavowed…"  The only support in the plea record for that finding is from the March 5, 2002 letter written by the AUSA to defense counsel.  There was no testimony, no affidavit, nothing beyond the hearsay assertion from that letter.  The Defense has not been able to discover any document or policy statement from the indictment period that disavows the policy stated in Bates 1026.  Due to the frustration over having never received a written basis for IDPA's disavowal of this Dental Policy Clarification, Dr. Rinaldi's defense requested all files of Stephen Bradley, the head of the IDPA Bureau and all files of any IDPA personnel related to the Dental Policy Clarification under an Illinois Freedom of Information Act request.  In response, the IDPA provided the 30-page Doral Dental Services of Illinois, Inc. Office Reference Manual ("the Doral Manual").  Orthodontic Services are addressed on pages 28-29 of the Doral Manual (Exhibit 4).  As hereinbefore stated the IDPA has refused to provide records relating to 1026 or its disavowance and IDPA has not provided a basis for its denial. Instead the FOIA response argues what the document means. The IDPA argument is refuted by Mr. Spinner. One must wonder what IDPA is attempting to hide?

The government did not and could not show a legal basis for disavowing the pro rated benefit policy under which Dr. Rinaldi submitted monthly adjustments, thus, the plea agreement must be set aside because it was induced by a representation that was not possible of being fulfilled and is based on an interpretation.

D.  THE COURT'S RELIANCE ON SECTION 100 TO DENY THE MOTION TO WITHDRAW THE PLEA IS MISPLACED.

Section 100 was not provided to the defense as a basis to support the plea until after the plea was entered.  It was provided for the first time attached to the June 21, 2002 letter from AUSA Patrick Hansen to Attorney Michael J. Costello.  This letter indicates that the Government was relying on Section 100 of the Provider's handbook as the source of criminal liability, (attached as exhibit 2 to the Government's Response to Motion to Reconsider Order filed March 24, 2003) was not provided to the Defense until after the plea was entered.  The timing of this prevented Counsel from exploring whether Orthodontists actually received section 100 from IDPA before the entry of the plea; whether orthodontists also received later material contradicting §100; whether if received it applied to orthodontists; whether §100 was in such conflict with other rules and procedures that it was so ambiguous that a conviction could not be supported or whether the Defendant's interpretation of the rules was reasonable.

COUNSEL WOULD NOT HAVE ADVOCATED THE PLEA

Counsel for Dr. Rinaldi at the time of the entry of the plea would not have advocated the plea had he known that dentists did not receive section 100 or that the issue

25

was in dispute as described herein.  The reasonable interpretation and ambiguity in the

rules and other issues herein would have been a question for the jury.  The first time the

defense saw section 100 was attached to the June 2002 letter.  Through FOIA procedures

the Defense has sought information from IDPA to confirm that David Spinner is correct

when he related that Section 100 was not provided to dentists during the indictment

period.  IDPA has responded and the matter is still confused.  The documents received in

response to the FOIA request leave the matter confused and ambiguous as afore

described. (Exhibit 12)

B.  THE REGULATIONS, AND VARIOUS POLICY STATEMENTS ISSUED BY IDPA,
DCFS, DELTA AND DORAL MADE THE BILLING AND PAYMENT FOR MISSED ORTHODONTIC
TREATMENT VISITS AMBIGUOUS TO THE DEGREE THAT IT WILL NOT SUPPORT A CONVICTION
FOR FRAUD.

A statute or regulation must provide sufficient notice to a person to conform his

actions to the rule and thus avoid criminal liability.  "A criminal statute must, if it is to

comport with the requirements of due process, give fair notice of its prohibitions to those

persons potentially subject to it. The primary purpose of this doctrine as articulated in the

modern cases is the realistic one of limiting prosecutorial discretion rather than the

unrealistic one of protecting the reliance of people--for there are precious few--who

actually read statutes, criminal or otherwise, before deciding whether to do something.

*Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222

(1972); *Waldron v. McAtee,* 723 F.2d 1348, 1354 (7th Cir.1983); *United States v. White,*

882 F.2d 250, 252 (7th Cir.1989)."  *Kucharek v. Hanaway,* 902 F.2d 513, 518 (7th Cir.

1990).  The conflict and ambiguities in the regulations, policies and practices of IDPA

billing do not comport with this due process requirement of specificity and therefore

cannot support a criminal conviction in this case.

## C.  RINALDI'S INTERPRETATION OF THE REGULATIONS AND POLICIES WAS REASONABLE, AND DOES NOT SUPPORT A FINDING OF CRIMINAL INTENT

A criminal Defendant cannot be found guilty of the violation of a regulation if his interpretation of that regulation is reasonable.  *U.S. v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002).  As the Court noted in its December 9, 2004 Opinion denying the Defendant's Motion for Reconsideration at page 22, the Government provided the Defense with the Policy Clarification, Bates stamp 1026, which clearly and unequivocally states that; "The Dentist can bill the monthly adjustments code whether he sees the patient or not."  This Policy Clarification endorses Rinaldi's interpretation of the legality of his billing practices.  The Court should note that this Policy clarification was released in March 2000, which is at the tail end of the indictment period.  Defendant suggests that this policy clarification simply restates the practice of IDPA for Orthodontic billing to that date.  Investigation by the Defense team in 2005 revealed that the Policy Clarification was authored by none other than David Spinner, Manager, Medical Assistance Dental Program, IDPA.  See, attached affidavit.  The fact that the Manager of the Medical Assistance Dental Program believed as late as 2000 that Dentists could bill the way Rinaldi was billing, endorses Rinaldi's billing.  If the Manager of the Dental Program believed the rules permitted this type of billing, Rinaldi's interpretation of the very same regulations and policies, of which he had to have been less familiar with than the IDPA Dental Program Manager, is reasonable.  If the government does not negate a contractor's reasonable interpretation, which would make the contractor's statements correct, there is insufficient evidence to support false claims liability.  *U.S. v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978).

27

Spinner stated in his April 11, 2005 interview with Deb McGregor that: "After the initial consult, installation and such, the monthly adjustments are then prorated."  Exhibit 1 page 6.

Spinner stated in his April 11, 2005 interview with Deb McGregor that; "The clarification was for the internal auditors.  They did not know the policy and thought the manual was not specific enough."    This evidenced that when asked by 'internal auditors' what the manual meant that it was not clear enough for internal auditors to figure out, David Spinner, Manager of Dental Programs for IDPA in March 2000, advised the 'internal auditors' that the manual meant that orthodontists did not need to see the patient to be paid for a monthly adjustment.  (Exhibit 1 and 1026)  The Defendant suggests that this can only be because the billing was a pro rated payout of the remaining orthodontist fees and was not a fee for service tied to any specific date.  This is the only way that the 'active treatment' rule and all of the foregoing can be rationally reconciled.

The confusion within IDPA continued at least until December 2000 is evident when The Illinois Center for Health Workforce Studies issued the report entitled, "Access to Dental Care for Low–income Children in Illinois, December 2000.  (Exhibit 11)  At page 24 of this document it is stated, "Orthodontics are most often billed by the case, in monthly installments over the course of treatment."  The table wherein this statement is made came from IDPA.  This disputes the IDPA response to the FOIA that 1026 was never policy.  Exhibit 12, page 7.  Further this report identifies the members of the Dental Advisory Group – Members and Invited Guests, who presumably have some oversight to the final report.  This list includes Ann Lattig, Senior Public Service Administrator, Bureau of Comprehensive Health Services, Illinois Dept. of Public Aid; Henry Lotsof,

DDS, Vice President, Doral Dental Services of Illinois; Matt Powers, Administrator,

Division of Medical Programs, Illinois Dept. of Public Aid; Steve Geiermann, DDS,

Regional Dental Consultant, Bureau of Primary Health Care, Health Resources and

Services Administration; **Dave Spinner, Manager, Medical Assistance Dental**

**Program, IDPA**; and Lewis Lampiris, DDS, MPH, Chief, Division of Oral Health,

IDPA.  (Exhibit 11)  This evidences that the orthodontic pro rata payment system was

widely accepted as standard practice among these noted experts within the

Medicaid/dental system.

As stated infra, the standard practice of Orthodontist billing is as a pro rata

system.  Other insurance and Government payment systems treat Orthodontics as a pro

rata system.  An interpretation of regulations based on similar billing systems is not

unreasonable.  Rinaldi's interpretation of the policies is consistent with many other

experts in the field and therefore is not clearly unreasonable.  If Rinaldi's interpretation is

not unreasonable, there is no intent to defraud and he is actually innocent of these

charges.

3.  THE COURT ERRED BY REQUIRING THE DEFENDANT TO MEET A
SUBSTANTIAL EVIDENCE STANDARD WHEN THE SEVENTH CIRCUIT IN
*GOMEZ-OROZCO* ONLY REQUIRED 'CREDIBLE' EVIDENCE.

This Court has misapplied the law of *Gomez-Orozco*, 188 F. 3rd 422 (7th Cir.

1999) to this Defendant's case.  The Seventh Circuit in *Gomez-Orozco* held that to allow

a defendant to withdraw his plea of guilty based on a claim of actual innocence; the claim

of actual innocence must be supported by "credible" evidence.  *Gomez-Orozco* at 425.

("Being legally innocent of a crime is a fair and just reason to withdraw a guilty plea.

*United States v. Groll,* 992 F.2d 755, 758 (7th Cir. 1993).  However a blanket claim of

innocence does not mandate the court to allow a defendant to withdraw his plea. *Id*. The claim must be supported by credible evidence*." Id.)*.  Sub Judice the Defendant has presented highly credible evidence to support the request to withdraw the plea of guilty.

This Court erred by focusing on the competing experts of the Government rather than determining whether the Defendant had presented sufficient credible evidence on his claim of actual innocence.  This Court's order then concluded that the Defendant's AADD diagnosis did not prevent him from formulating criminal intent.  The *Gomez-Orozco* Court noted that Gomez-Orozco had presented substantial, though disputed, evidence that his parents were married under the common law of Texas and further concluded that the Defendant had presented "enough" evidence to withdraw his guilty plea.  In *Gomez-Orozco* the "substantial" credible evidence in dispute involved two family affidavits and a travel document.  The Seventh Circuit found it was "possible" that a jury might find reasonable doubt about his alienage.  Sub Judice the defendant has presented "credible" evidence in the form of reports written by various experts.  These reports are credible evidence to support the withdrawal of his guilty plea because it is "possible" that a jury might find reasonable doubt about the Defendant's ability to formulate criminal intent.  Sub Judice the Defendant's "credible" evidence was more substantial than that in *Gomez-Orozco*.  Defendant suggests that although he is not required under *Gomez-Orozco* to present substantial evidence, merely credible evidence, he has in fact presented substantial and credible evidence in the form of these mental evaluations.

4. THE COURT ERRED BY ATTEMPTING TO DETERMINE THE ULTIMATE DECISION OF GUILT OR INNOCENCE BY DECIDING THAT THE DEFENDANT WAS NOT SUFFERING A MENTAL ILLNESS THAT WOULD PREVENT HIM FORM FORMULATING THE REQUISITE CRIMINAL INTENT, AND BY DECIDING THAT THE DEFENDANT HAD MADE MATERIALLY FALSE STATEMENTS IN VIOLATION OF THE PROVIDER'S HANDBOOK, WHERE THE *GOMEZ-OROZCO* COURT LEFT THE CONTESTED ISSUE OF GUILT OR INNOCENCE TO THE JURY AND MERELY DETERMINED THAT THE DEFENDANT HAD PRESENTED ENOUGH EVIDENCE TO PASS THE ISSUE ON TO A JURY.

The Government's continued assertion that the Defendant was involved in a massive scheme to defraud is inaccurate. Defendant continues to assert that there was no fraud, and certainly no "massive scheme" and any errors in his billings to the State were because of his diminished capacity and his reasonable interpretation of the general policy. His interpretation is mirrored in the document with the Bates stamp 1026. Any other mistakes in billing were made without intent to defraud, but rather were due to the Defendant's particular mental health issues.

The Defendant here is in the same situation as the defendant in *Gomez-Orozco,* as both have a substantial claim of actual innocence. In *Gomez-Orozco,* the 7th Circuit did not require that the Defendant prove himself innocent in order to meet the 'fair and just' element of Fed. R. Cr. Pro 32(e). The Court required that a person attempting to withdraw a plea, before sentencing, present 'credible' evidence' of actual innocence. The claim of actual innocence in *Gomez-Orzoca* was that the defendant thought his father might actually be a U.S. citizen, and his mother and father might have been married under the common law of Texas. This revelation came in the context of a charge of illegal re-entry by an alien in violation of 8 U.S.C. §1326(a). According to the facts discussed in the 7th Circuit opinion, Gomez-Orzoco's credible evidence was an affidavit

31

from his sister, an affidavit from his father and a travel document prepared by his mother. *Gomez-Orzoco at 427.*

Sub judice the Defendant has submitted reports of respected mental health professionals and documentation of the billing policies.  This is much more than was presented by the defendant in *Gomez-Orzoco.*  Defendant herein should be permitted to withdraw his plea just as the Defendant in *Gomez-Orzoco.*

## 5. THE COURT ERRED BY HOLDING THAT THE DEFENDANT'S CLAIMS WERE NOT "CLAIMS OF ACTUAL INNOCENCE."

At page 27 of the Court's December 9, 2004 Opinion, the Court holds; "None of the Defendant's arguments involve a claim of actual innocence."  Defendant respectfully suggests that all the claims presented in the Defendant's motion to withdraw the plea are claims of actual innocence.  Each of the claims negate one of the essential elements of the crimes charged i.e., criminal intent for the diminished capacity and materiality and/or criminal intent for the pro rated issue.  If the Government cannot prove each and every essential element of the crime charged, the Defendant is actually innocent of the charge.

DIMINISHED CAPACITY TO FORM CRIMINAL INTENT

The Defendant has presented credible evidence of his diminished capacity.  This is also a claim of actual innocence.  Both fraud and obstruction are specific intent crimes. The defense of diminished capacity, if proven to a jury, negates the specific intent element of the both the fraud and the obstruction charges.  Thus this is a claim of actual innocence.

This defense is recognized in the Seventh Circuit.  *U.S. vs. Rusin*, 889 F. Supp. 1036 (N.D. Ill. 1995) discusses this rule and cites the relevant cases from the Seventh

Circuit Court of Appeals.  In *Rusin*, supra, the defendant was charged with two counts of knowingly converting approximately $75,000.00 in property sales proceeds belonging to the U.S. Department of Veterans Affairs.  The psychological evaluation of Rusin concluded that he suffered from Alcohol Withdrawal Induced Mood Disorder with Mixed features at the time of the alleged crimes.  In *Rusin*, supra, the court found that a successful diminished capacity defense means that the prosecution has not proven the defendant's guilt.  Diminished capacity is a viable defense when specific intent is an element of the charged offenses.

The charges sub judice are specific intent crimes.  Inadvertent, negligent or reckless actions fail to prove specific criminal intent.  Dr. Robert E. Chapman M.D, S.C. has evaluated the Defendant, Sergius Rinaldi, and has diagnosed Rinaldi as having Adult Attention Deficit Disorder.  He further states that an explanation of Dr. Rinaldi's behavior would be that it flows from the Defendant's limited capacity to organize and follow through driven by impaired impulse control.  Dr. Chapman also states that the Defendant's AADD would explain hiding documents and altering records, if indeed the Defendant committed the acts alleged.  Dr. Chapman states that the Defendant's "capacity to form criminal intent is diminished as the result of Adult Attention Deficit Disorder."  "This lack of capacity would apply to all of the charges and allegations."

The Defendant's impaired capacity calls into question the Defendant's guilt and thus is an independent reason under Rule 32(e) for the Court to permit the Defendant's guilty plea.  This motion is made before sentencing and therefore the standard is "any fair and just" reason.

THE "PRO RATA FEE" ARGUMENT IS A CLAIM OF ACTUAL INNOCENCE
BOTH FOR THE FRAUD CHARGE AND THE OBSTRUCTION CHARGE

The claim that the fee was a pro rata fee is a claim that negates the materiality element of the fraud charges.  For a fraud conviction to stand there must be a false statement of *material* facts.  *Neder v. United States,* 527 U. S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)  (Materiality is an element of a "scheme or artifice to defraud' under the federal mail fraud, wire fraud, and bank fraud statutes.)  See also, *United States v. Fernandez, 282 F. 3d 500 (7th Cir. 2002).*  This claim, related to the materiality of the date of service, is a claim of actual innocence.  The indictment alleges that the fraud is that on the payment vouchers the Defendant sent in for payment he did not see the patient on the date entered on the claim form.  The specific date of service is not material under a payment system where the doctor receives the same amount from IDPA if he sees the patient once or ten times in one month, or if he did not see the patient at all that month. Under such a system, the date of service is not material to the right to be paid.  The pro rata fee arrangement permitted the orthodontist to bill monthly whether the service was actually performed that month or was in fact performed multiple times during a given month.  The document with Bates no 1026 clearly indicates that it was a pro rata fee system.  As set out above, the active treatment rule and the CDT codes all suggest the dates of service is immaterial to whether IDPA would pay the monthly adjustment fee. This is a claim of actual innocence.

The Defendant also made a claim of actual innocence that the regulations and policies are so ambiguous that they are not specific enough to create criminal liability.

The Defendant also made the claim of actual innocence that his interpretation of the regulations was consistent with the Manager of the Dental Program for IDPA, as well

consistent with an array of notables, consistent with other billing systems for insurance companies and other Government programs and had not been clearly refuted during the indictment period and therefore there was no criminal intent. In *United States v. Migliaccio,* 34 F.3d 1517 (10th Cir. 1994) the 10th Circuit reversed a fraud case because the District Court had failed to instruct the jury that the government bears the burden to negate any reasonable interpretations that would make the defendant's statement factually correct. Whether section 100 applies to orthodontists is a jury question; whether the Defendant received notice of section 100 is a jury question; whether the rules are so ambiguous that they will not support a criminal conviction is a jury question; whether the Defendant's interpretation of the rules as pro rata is a reasonable interpretation is a jury question.

WHEREFORE, it is respectfully requested that this Court permit The Defendant, Dr. Sergius Rinaldi to withdraw his plea. The Government must now be put to its burden of proving every element of the crime. This will include proving that the billing regulations and statutes mandated a fee for service and not a pro rated benefit; that the rules were not so ambiguous that a criminal conviction may not follow; that the Defendant's interpretation of the rules was not reasonable and that the defendant had the mental capacity to form criminal intent; and that his actions were not mere mistake or error.

Respectfully submitted:




/s/ Michael J. Costello
Michael J. Costello
Illinois ARDC No. 522627
631 East Allen Street, Suite B
Springfield, IL 62703
217. 544.5500
Fax 217.544.7500
Counsel for Defendant




/s/ Thomas M. Dawson
Thomas M. Dawson, Esq.
Kansas Bar No. 06599
2300 South Fourth Street
Leavenworth, KS  66048
(913) 682-5331
(913) 682-8363 facsimile
dawsonlaw@aol.com

Counsel for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a copy of the foregoing Defendants' Memorandum in Support of Motion to Reconsider Order upon Patrick D. Hansen, Assistant United States Attorney, by ECF, this 23rd day of August 2005.

_____
Thomas M. Dawson, Esq.