E-FILED
Thursday, 01 September, 2005 04:18:51 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 01-30110 |
| SERGIUS RINALDI, | ) | |
| Defendant. | ) | |

DEFENDANT'S SENTENCING MEMORANDUM AND COMPLIANCE
WITH SCHEDULING ORDER

The Defendant by and through counsel respectfully submits the following information in support of the Defendant's objections to the PSR and request for mitigation. In this pleading the Defendant will further comply with the scheduling order by providing a witness list, exhibit list and outline of the evidence to be produced.

THE PLEA

The Defendant entered a plea of guilty to Counts One and Thirteen of a thirteen-count indictment filed herein on March 5, 2002. As described by the Government during the plea colloquy Count One charged that the Defendant participated in a scheme to defraud; that to carry out the scheme the Defendant used the United States Mail; that the Defendant used materially false information in the scheme to defraud and that the Defendant

1

did so knowingly with intent to defraud. At the time of the plea colloquy the Government described generally that the Defendant during the indictment period would bill for monthly adjustments to braces which he did not perform; that on two occasions the Defendant billed for putting braces on children when that was not done; that specifically as to Count One the Defendant billed for a monthly adjustment for a client identified as JB on August 9, 2000, when in fact the client was not in the State of Illinois on that date. On the same date the Defendant entered a plea of guilty to Count 13 of the Indictment. Count 13 as described by the Government during the plea colloquy charged the Defendant with knowingly and intentionally taking some action to prevent and obstruct, mislead or delay communications of records to a criminal investigator or attempted to do so; that the actions were with respect to a Federal health care offense and that the Defendant did so willfully. The factual basis for Count 13 as described by the Government during the plea colloquy included the fact that the Defendant had received a grand jury subpoena on or about January 23, 2001; that between January 23, 2001 and July 3, 2001 the Defendant removed records from his office that were responsive to the subpoena; that on or about July 3, 2001 the Defendant was seen removing certain records from his office in anticipation of a search by Federal agents later that day; that the records were recovered

2

and did contain certain sign in sheets responsive to the subpoena previously issued.

## OBJECTIONS TO PRESENTENCE REPORT

### THE LOSS

The loss attributable to the Defendant for conduct charged in the indictment and admitted by the Defendant at the plea colloquy is $78.13.

The Government in paragraph 15 of the presentence report suggests that the Defendant should be held accountable for relevant conduct increasing his guideline range for offense conduct. The Government provides a list of 54 clients. The Government asserts that the additional loss attributed to the alleged fraud of the Defendant from this list of clients is $25,844.35. The Defendant objects to this loss and this relevant conduct being attributable to him for sentencing.

The Fifth Amendment right to due process of law and the right to a jury trial encompassed in the Sixth Amendment precludes the Court from increasing the Defendant's sentence based on information to which the Defendant did not enter a plea. See, *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531. Accordingly the Defendant's guidelines base sentence pursuant to U.S.S.G. § 2B1.1(a) is a level 6. A level 6 with Criminal

History Category 1 allows for a sentence of 0-6 months. This also falls into Zone A, which permits a sentence of probation.

Due process of law prohibits retrospective application of certain judicial rulings such as the remedy portion of the *Booker* decision to cases occurring before the decision. Therefore for this sentencing the sentencing guidelines are mandatory and are limited by the holdings in Blakely and Booker to the degree that the sentence can only be based on facts found by a jury beyond a reasonable doubt or admitted by the Defendant.

This case is still within the direct process therefore this Defendant is entitled to application of any favorable Supreme Court rulings. *Blakely* and *Booker* are such favorable decisions. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). For this sentencing the guideline are mandatory, because to apply the remedial portions of the *Booker* decision to this sentencing violates Due Process. Ex Post Facto Principles incorporated in the Due Process Clause preclude application of Justice Breyer's majority opinion revising the Sentencing Reform Act (the remedial portion of the decision) to the Defendant's case in that it disadvantages the Defendant. Justice Stevens's majority opinion results in a constitutional rule that benefits the Defendant and applies to the Defendant. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). The remedial portion of *Booker*, supra, authored by Justice Breyer

4

modified the Sentencing Reform Act by severing and excising 18 U.S.C. § 3553(b)(1) (which makes the guidelines mandatory) and 18 U.S.C. § 3742(e) (which depends upon the guidelines mandatory nature) thus converting the Guidelines from mandatory to advisory for the first time. In doing so the remedial portion of the decision increased the maximum penalty that may be constitutionally imposed from that in a mandatory system—"the maximum authorized by the facts established by a plea of guilty or a jury verdict," *Booker*, supra at 756, to that applicable in an advisory system. A new law that increases either the statutory maximum sentence, *Lindsey v. Washington*, 301 U.S. 397, 401-402 (1937) or the presumptive sentencing range, *Miller v. Florida*, 482 U.S. 423-433 (1987) violates the Ex Post Facto Clause of the United States Constitution. The Due Process Clause affords an accused similar protection from retroactive application of law by the Courts when a statute has undergone judicial construction or revision that would increase a sentence. See *Marks v. United States,* 430 U.S. 188, 191-192 (1977) and *Bouie v. City of Columbia,* 378 U.S. 347, 353-354 (1964). The Breyer Majority retroactivity declaration, *Booker*, supra, refers to constitutional rules that "benefit" defendants, *Griffith*, supra, not to a judicial revision of a statute that disadvantages a defendant, which is precluded by the Due Process Clause. Thus this defendant is entitled to be sentenced

5

under mandatory sentencing guidelines limited to the facts admitted by the defendant, as there has been no jury.

To the extent the Court considers the alleged relevant conduct due process of law requires the standard of beyond a reasonable doubt in making factual findings of relevant conduct if the conduct was not admitted by the Defendant or proven to a jury beyond a reasonable doubt.  As held in *In re Winship,* 397 U.S. 358, 363-64 (1970), the reasonable doubt standard is derived from the Fifth Amendment's Due Process Clause.  In *Winship,* the Supreme Court, in the context of a judge's determination of juvenile delinquency, held that the Due Process Clause requires that the juvenile's potential loss of liberty, even though no jury was involved, be preceded by a finding that the government has borne its burden of proving guilt beyond a reasonable doubt. 397 U.S. at 361-64.

In *Jones v. United States,* 526 U.S. 227 (1999), the Supreme Court foreshadowed the developments that led to *Booker.*  In construing the carjacking statute to avoid constitutional doubt, the Court noted that, "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact, other than prior conviction" that increases the maximum penalty for a crime must be charged in an

indictment, submitted to a jury, and proven beyond a reasonable doubt. *Jones,* 526 U.S. at 243 n.6.

In *Apprendi v. New Jersey,* 530 U.S. 466 (2000), the Court built on *Jones* to discard distinctions between elements and sentencing factors to find that any fact (other than prior conviction) that increased the maximum sentence had to be proved to a jury beyond a reasonable doubt. *Apprendi* expressly referred back to the due process roots of the reasonable doubt requirement: "Since *Winship,* we have made clear beyond peradventure that *Winship*'s due process and associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence. *Apprendi,* 530 U. S. at 484 (citation omitted).

In *Ring v. Arizona,* 536 U. S. 584 (2002), the Court, in its most explicit pronouncement on the issue, made clear that any "increase in a defendant's authorized punishment contingent on the finding of a fact, that fact -- no matter how the state labels it -- must be found by a jury beyond a reasonable doubt." 536 U.S. at 602. The tandem treatment of jury trial and reasonable doubt was separated in *Summerlin v. Schriro,* 124 S. Ct. 2519 (2004), in which the Court held that *Ring* was not retroactive. Having found that the rights at stake were fundamental, the Court then had to consider whether the

7

rule implicated "the fundamental fairness and accuracy of the criminal proceeding." *Schriro,* 124 S. Ct. at 2524 (citing *Saffle v. Park,* 494 U.S. 484, 495 (1990) (quoting *Teague v. Lane,* 489 U.S. 288, 311 (1989). The Supreme Court did engage in a great deal of discussion as to whether the accuracy of facts found by a jury were more accurate than those facts found by a Judge even where both were required to use the same beyond a reasonable doubt standard. Because the Sentencing Court used the beyond reasonable doubt standard in determining the facts increasing the Defendant's sentence and that this protected the accuracy of the rulings, retroactive application of *Ring v. Arizona* was not necessary

In *Blakely v. Washington,* 124 S. Ct. 2531 (2004), the Court applied the jury trial and reasonable doubt holdings of *Apprendi* to state sentencing guidelines. 124 S. Ct. at 2536. This decision set the stage for a decision regarding the federal sentencing guidelines, which the Ninth Circuit indicated were implicated by *Blakely* in *United States v. Ameline,* 376 F.3d 967 (9th Cir. 2004).

In *Booker,* the merits majority specified that the question was whether the Federal Sentencing Guidelines violated the Sixth Amendment. The *Booker* majority repeated, in the context of the right to have the jury find facts, that the facts must be "reflected in the jury verdict or admitted by the

8

defendant." *Booker* therefore left the precedent in place requiring proof beyond a reasonable doubt of factors increasing the offense level

The information in the Pre-sentence report related to these 54 patients does not sustain the Government's burden of proof at sentencing be it a preponderance of the evidence or, as the defense suggests, beyond a reasonable doubt.

The allegation with respect to the 54 clients and the loss of $25,844.35 is not accurate. At the sentencing proceedings the Defendant will introduce evidence through investigator Deb McGregor with respect to these 54 clients. The evidence will demonstrate that reliance on these 54 clients to increase the Defendant's time in confinement is misplaced. The evidence will include a review of the discovery material received from the State of Illinois and the Government. Those documents will be exhibits and will be provided to the Government simultaneously with the filing of this sentencing memorandum. The evidence will demonstrate among other things that the losses attributable to the 54 clients are incorrect; that in many instances the clients either saw the Defendant as billed, saw the Defendant in the same month of the billing even if the service date was incorrect, did not fail to miss more than two consecutive appointments and thus were properly billed

under the 'active treatment' rule, were otherwise proper billings and even when errors were made it was mistake not fraud.

Dr. Thomas Langford will testify. Dr. Langford will present testimony of his understanding of the Defendant's billing practice regarding direct payment by IDPA/DCFS, Delta and Doral, the errors and how those errors occurred. Dr. Langford will describe evidence of the disarray and confusion in the State's records including the State changing the dates of service submitted by the Defendant, the State white inking out date of service information provided by the Defendant and including new information, the State's use of multiple unique ID numbers for clients, wrong names and other errors that will place into question the extent to which the State's records should be relied upon to increase the Defendant's sentence. The evidence will indicate that in many instances the Defendant was not paid at all for service to clients. This will suggest that the Government's allegations are in reality mistake and not fraud. A Defendant operating a scheme to the extent the Government alleges would not leave easily collectible accounts unpaid. The exhibits relied upon in respect to the testimony of Dr. Langford will be provided to the Government simultaneously with the filing of this pleading.

# OBSTRUCTION

The Government asserts that after receiving a grand jury subpoena on January 23, 2001 the Defendant between January 23, 2001 and July 3, 2001 removed records from his office that were responsive to the subpoena; that specifically on or about July 3, 2001 the Defendant was seen removing certain records from his office in anticipation of a search by Federal agents later that day and that the records recovered did contain certain sign in sheets responsive to the subpoena.  The inventory of the recovered box Rinaldi was seen removing from his office reveals a random assortment of records in haphazard order, rather than any systematic attempt to avoid the subpoena.  Those records while including some items subject to the subpoena were in fact the haphazard collection described.  The records were in no particular order and found within the box were tax returns, depreciation schedules, various tax documents, a Northwest envelope and world perks information, a variety of business cards, Southwest Rapid Rewards Visa Gold brochures, life insurance forms, continuing education documents, letters both form and personal, AT & T statements, family reading programs etc.  The collection in the box describes the chaos in the Defendant's life and this is a better explanation than criminal activity.  The Defendant did not admit to removing other documents from his office.

## DIMINISHED CAPACITY

USSG 5K2.12 provides that a sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity.

The Defense will present the testimony of Robert E. Chapman, M.D., SC.  With respect to the Motion to Withdraw the plea of guilty the Court has been provided a forensic report by Dr. Chapman dated January 9, 2003.  Dr. Chapman has prepared a second forensic report dated February 7, 2005 attached hereto as exhibit 1.  In addition to the original material reviewed as set forth in the 2003 forensic report Dr. Chapman in preparing exhibit 1 reviewed the following: Psychiatric Examination of Phillip Bornstein, M.D.; Forensic Neurological and Psychological Evaluation of George Athey, Jr., Ph.D., ABPP; copy of Magnetoencephalography Report from the Houglund Brain Imaging Center; Psychological Report of Helen P. Appleton, Ph.D; Cognitive Assessment for Dementia by Ronald Zec, Ph.D., ABPN, ABPP/ABCN, Associate Professor Clinical Neuropsychology, SIU; Evaluation of Sue Moriearty, Ph.D., ABPP-F, Clinical Psychologist.  All of this information has been provided to the Court and to the Government to the best knowledge of the Defendant.

Based on Dr. Chapman's review of the above reports and his extensive experience with AADD as described in exhibit 1 Dr. Chapman holds to the opinion that Dr. Rinaldi's behavior for which he is charged is not best understood as willful mal-intent but as a product of his affliction and impairment of Adult Attention Deficit Disorder and Cognitive Disorder. Logically flowing from this opinion is the idea that the Defendant committed the alleged criminal activity while afflicted by a significantly reduced mental capacity that is directly connected to the behavior leading to the charges and conviction. Dr. Chapman notes that every expert evaluating the Defendant has found some mental health issue impacting Dr. Rinaldi and that the disagreement is the extent and nature of the mental health problems and the impact of these problems on Rinaldi's ability to formulate criminal intent.

The Defense will present the testimony of George Athey, Jr., Ph.D., ABPP. Dr. Athey's report has been provided to the Government and the Court. Raw data from testing conducted by Dr. Athey has also been provided to the Government. Dr. Athey will testify regarding the testing identified in the report and all matters relevant to his opinion that the Defendant was not capable of formulating criminal intent. Logically flowing from this opinion is that the Defendant committed the alleged criminal activity while afflicted by a significantly reduced mental capacity that is

13

directly connected to the behavior leading to the charges and conviction. Dr. Athey's September 1, 2005 updated report is attached hereto as exhibit 2.

Ronald Zec, Ph.D, ABPN, ABPP/ABCN, Associate Professor Clinical Neuropsychology will be called to testify for the Defense. Dr. Zec's report discusses his impression that the Defendant suffers from ADHD and discusses the implications of this diagnosis for the Defendant's everyday functioning, including that his ADHD with its symptoms of inattention, hyperactivity and impulsivity significantly contributed to his disorganization at work with respect to paperwork and poor record keeping. This testimony goes to the issue of diminished capacity with respect to the alleged criminal behavior.

While the Court has concluded in the Order denying the Motion to Withdraw the plea of guilty that the Defendant was able to formulate criminal intent (The Order is again being revisited) the Defendant suggests that at a minimum the Defendant committed the alleged criminal activity while afflicted by a significantly reduced mental capacity that is directly connected to the behavior leading to the charges and conviction.

GOVERNMENT REQUEST FOR UPWARD DEPARTURE

The Government is requesting two upward departures. The first is an upward departure from the sentence permitted by the conduct admitted by this Defendant during the change of plea based on the patients listed in the PSR. As stated above, the only patient mentioned in Count 1, J.B. represents only $78.13. These patients are not all the same patients contained in the indictment. Most of the patients in the PSR are not in the indictment. In fact some of the patients in the indictment are not also in the PSR. There is some overlap between the two lists of patients. The government is also requesting another upward departure on the basis that even after inflating the relevant conduct with patients not charged in the indictment nor admitted to by the defendant that the additional patients in the PSR understate the amount of loss.

The loss in this case can be determined. The Government elected not to make the effort to make that investigation. They should not now be permitted to have the Defendant's sentence enhanced on the basis of statistically unsound extrapolation from a few hand picked worse cases rather than a statistically valid random sample of the defendant's entire patient visits.

15

The Government's request for an upward departure sentence is an attempt to extrapolate the 54 patients to the entire universe of patients that Dr. Rinaldi saw during the indictment period. For such an extrapolation to have any statistical legitimacy the sample must be a random sample of the whole. See, *United States v. Skodnek,* 933 F. Supp. 1108, 1117 (D. Mass. 1996). The Government's sample (the 54) is not random, rather they are hand-picked worse cases. Therefore it is statistically improper to extrapolate them to the entire universe of patients to support the claim that the loss is greater than the Government has proven or to allege a "tip of the iceberg" argument.

The Court should examine the Government's undisclosed methodology for selecting these 54 patients as their sample. Are they a true random sample of Rinaldi's entire billings or were they selected based on some other criteria. If they are not truly random, they cannot be extrapolated to the whole.

The Court should explore the Government's sample of 54 and determine whether the 54 represent fraud. As set out in the recent motion to withdraw plea, IDPA policy, termed the active treatment rule, permitted orthodontists to bill their monthly adjustment fee even if they did not see the patient that month, as long as the patient is in active treatment. IDPA

defined active treatment as not missing more than two consecutive appointments. Dave Spinner in exhibit 1 to the Motion to Reconsider the Court's Order of December 9 2004 confirms this position. Dr. Langford or Deb McGregor will testify as to which patients of the 54 were in active treatment and therefore do not represent fraud and therefore should not be considered as relevant conduct at this sentencing.

Further the amounts associated with the 54 patients in the PSR do not represent the total billings for that patient. The Government must have some undisclosed methodology for which billings for these patients they determined were loss and which were not for relevant conduct purposes. The Court should closely examine this methodology. Dr. Langford will address these issues in his testimony

## ADVISORY GUIDELINES

If the Court rejects the Defendant's arguments above and determines to sentence him under an the advisory guidelines system crafted by Justice Breyer, this Court should sentence the Defendant Rinaldi to less time than the advisory guidelines would indicate due to his mental health issues, and the confusing and contradictory policies and regulations of the Medicaid program. Further this Court should consider whether a sentence that

includes incarceration is necessary to effectuate the purposes of 18 U.S.C. §3553(a).

Respectfully submitted:

/s/ Thomas M. Dawson
Thomas M. Dawson, Esq.
Kansas Bar No. 06599
2300 South Fourth Street
Leavenworth, KS  66048
(913) 682-5331
(913) 682-8363 facsimile
dawsonlaw@aol.com

Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Defendants' Memorandum upon Patrick D. Hansen, Assistant United States Attorney, by ECF, this 1st day of September 2005.

/s/ Thomas M. Dawson
Thomas M. Dawson, Esq.
