# Robert E. Chapman, M.D., SC

*Diplomate of the American Board of Psychiatry and Neurology*
*Diplomate of the American Board of Forensic Psychiatry*
*Fellow of the American College of Forensic Psychiatry*

Robert E. Chapman, M.D.,SC
P.O. Box 1404
Bloomington, IL 61702-1404

Phone: (309)454-2205
FAX: (309)454-5770
email: RECMDMBA96@wolfstation.net
www.wolfstation.net/robertchapman/forensi

February 7, 2005

Thomas M. Dawson
Attorney at Law
2300 South Fourth Street
Leavenworth, KS 66048

Re: Rinaldi, Sergius Alexander (dob 10 July 1936)
    U.S. Dist. (C.D. IL) 01-30110

Dear Mr. Dawson:

At your requested I reviewed the supplied reports and have prepared the following comments.

RECORDS REVIEWED:
Copy of Psychiatric Examination by Philipp E. Bornstein, M.D., Psychological Center, Springfield, Illinois, 5/20/04
Copy of Forensic Neuropsychological and Psychological Evaluation Report by George Athey, Jr., Ph.D., ABPP, Heritage Mental Health Clinic, Topeka, KS, 10/12/03
Copy of Magnetoencephalography Report by Jeffrey David Lewine, Ph.D., and William J. Nowack, M.D., University of Kansas Medical Center, Hoglund Brain Imaging Center, 03/01/04
Copy of Psychological Evaluation by Heien P. Appleton, Ph.D., Springfield Psychological Center, Springfield, IL, 5/6/04
Copy of Cognitive Assessment for Dementia on Sergius Rinaldi (SIU#00-15-51) Using The SIU Comprehensive Cognitive Battery for Dementia by Ronald F. Zec, Ph.D., ABPN, ABPP/ABCN, Associate Professor Clinical Neuropsychologist, 6/21/04 and 7/02/04
Copy of Sergius Rinaldi No: 01-30110 Court Ordered Evaluation by Sue Moriearty, Ph.D., ABPP-F, American Board of Professional Psychology, Diplomate in Forensic Psychology, Illinois Licensed Clinical Psychologist, 5/28/03
Copy of Opinion of Richard Mills, U.S. District Judge regarding Sergius Rinaldi's Motion to withdraw his plea of guilty and reconsideration of that ruling, 12/9/04
Copy of Forensic Report by the undersigned, 1/9/03

A motion asking the Court to reconsider the Order denying his motion to withdraw the guilty plea had as one of its' bases that the defendant suffers from Adult Attention Deficit Disorder and that the disorder prevented him from forming the requisite criminal intent at the time of the offenses.

The Court's finding of #155-3 competence to form the intent to defraud was at issue and addressed in all of the "mental evaluations".

I, Dr. Chapman, opined in his report that the defendant's capacity for criminal intent was "diminished" as a result of his Adult Attention Deficit Disorder.

Dr. Athey, Jr. opined that the defendant is "not capable of formulating and carrying out the intent to defraud......". This opinion flowed from the doctor's considerable presentation of clinical evidence of a Cognitive Disorder.

Dr. Moriearty apparently did not find any cognitive dysfunction and by applying the Diagnostic and Statistical Manual Fourth Edition (DSM IV)) criteria for Attention Deficit Hyperactivty Disorder for children could not find Adult Attention Deficit Disorder. She intoned that the "defendant" did not clearly meet the criteria for Adult Attention Deficit Disorder. She buttressed her opinion of no Adult Attention Deficit Disorder and of no cognitive dysfunction by citing her knowledge of the average range of functioning of men nearing the age of seventy and the evidence that the defendant had tried to inform himself of the clinical issues associated with Adult Attention Deficit Disorder as is recommended as part of the standard care for newly diagnosed patients. She furthermore informed that "there are those who believe that Adult Attention Deficit Disorder symptoms are too easily met". She did not share who "those" were i.e. professionals, lay public, TV pundits, or the Church of Scientology. She did not say what other common mental disorders she does not routinely "probe" for. She did address a question at issue to say what ever his clinical symptoms they "would not render him (defendant) incompetent when applied to most legal standards".

Dr. Ronald F. Zec determined that the defendant meets the DSM IV criteria for Adult Attention Deficit Disorder and that inattention, hyperactivity, and impulsivity associated with Adult Attention Deficit Disorder significantly contributed to the [defendant] disorganization at work with respect to his paper work and his poor record keeping. Although he does not address the legal issue of competence (he may not have been asked to) he does speak to a relevant issue of clinical competence to function adequately at certain tasks.

Dr. Bornstein addressed the legal question asked of him i.e. 1) Competence to stand trial; 2) Enter into a plea negotiation or 3) Form the criminal intent to defraud. The doctor apparently saw the need to buttress his opinion of the defendant's competence on all by citing the defendant's past activities that are not correlated to the tasks of keeping organized dental and billing records. He mentions things such as "design and build a building for his own use". (Apparently believing the defendant to have been without benefit of architect or construction contractor) The practice of orthodontia is heavily weighted with physical tasks that have limited variations and soon become routine even in two offices. This type of activity is not correlated to the task of organization of dental records and billing. The fact the defendant had a solo practice of orthodontia is relevant in that if he worked for some other practitioner or agency he would have been fired for poor organization skills especially relevant to dental record keeping and billing. This in spite of his intelligence.

Dr. Appleton did not take issue with the finding of Adult Attention Deficit Disorder or Cognitive Disorder but in addressing the issue of the defendant's ability to form the intent to defraud (able to form the intent) she expanded her opinion and expressed her incongruity that while performing "the full range of tasks required of an orthodontist" that he would be unable to "complete his paper work or bill properly. The court apparently found "this argument made by Dr. Appleton and others to be particularly persuasive". Again, Dr. Appleton made clinical correlation where none exists. To do this

the impairment ignores the uniqueness of the research findings of the executive functions in Attention Deficit Disorders.

While global levels of impairment may help to validate the condition in older subjects they should not be considered a diagnostic requirement of the disorder. This is analogous to the confusion over the use of family history in making psychiatric diagnosis. Even in highly familial disorders (e.g. ADHD, Bipolar Disorders, etc.), only a minority of cases will have a relative with the disorder. The same holds true for using impairment in correlated – but not core domains as a diagnostic requirement for chronic adult attention deficit disorder.

The reader is asked to see the attached copy of a lead article of the October 2004 Journal of Clinical Psychiatry and note "Area of Functional Impairment" and subtitle of "Executive Functioning". This is on page 1304 and a special note relevant to this case is the paragraph "Like some…."

The opinions of the reports regarding the issues of competence to defraud may be to the point even if the reasoning allegedly supporting those opinions is defective. It is true that several of the symptoms of Adult Attention Deficit Disorder are present in a relatively substantial percent of the population as is true of several of the symptoms of Diabetes. This fact should not be used to trivialize the diagnosis of Adult Attention Deficit Disorder.

I ask that the section of my 9 January 2003 report labeled Discussion be re-visited with special notice of the sentence that starts with "an alternative explanation…."

The argument for willful disorganized dental and billing record behavior that is without appreciation of underlying cognitive and executive function limitations of Adult Attention Deficit Disorder and Cognitive Disorder can in error lead to an allegation of intent to defraud.

My opinions and findings are based on my education, continuing study, and clinical experience of over thirty-five years of practice of clinical and forensic psychiatry and observations of highly trained, skillful and successful professionals in medicine who struggle with the affliction of Adult Attention Deficit Disorder.

The clinical experience included diagnosis and treatment of Adult Attention Deficit Disorder and the forensic evaluation of criminal defendant's who suffer Adult Attention Deficit Disorder. The study of clinical journals and information gleaned from courses, seminars, conferences, and workshops of professional organizations has improved my awareness of the prevalence, symptoms, and accompanying dysfunction of Adult Attention Deficit Disorder.

My observations associated with thirty-five years of medical staff function in a general hospital (see Curriculum Vitae) have provided additional insight.

An important duty required to maintain medical staff privileges i.e. to admit and treat patients, is to fulfill the duty of generating accurate, timely, and complete medical records. This so the hospital can keep certification and bill for the hospital's services. Failure to comply can result in suspension or loss of privileges after due process. One to two percent of the medical staff is in violation of these rules and regulations at any one time. They are usually the same people and are almost always of a surgical specialty. They are action-oriented people who are usually technically quite skilled. They are stimulated, focused, and calm while in the drama of the surgical suite. They dread the mundane and boring tasks of record keeping and procrastinate and avoid until threatened with expulsion from the

medical staff. The same is true in their office practices only saved by super competent office help. They are an enigma to the more organized members of the medical staff and the hospital administration. Only when it became evident that the violators suffered varying degrees of Adult Attention Deficit Disorder and special accommodations were provided to minimize the effects of their functional impairment was the chronic and vexing problem brought under control. These were very intelligent and highly clinically competent doctors who could "build an office and maintain a very successful surgical practice". There was no willful mal-intent but the cumulative challenges eventually overwhelmed their compensatory mechanisms.

One vascular surgeon was so overwhelmed that there were rumors of drugs, alcohol, illicit affairs, and more to explain his dysfunctional behavior. None were true and when Adult Attention Deficit Disorder was diagnosed and treated using many of the clinical management techniques so ably outlined in the Dr. Ronald F. Zec report the outcome was good and he was able to provide a valuable service to his patients, the hospital, and the community.

I admit that all this occurred in a therapeutic oriented setting rather than a punitive judgmental atmosphere. This is not to say that he and the other hardcore record keeping rule violators did not at times arouse substantial anger in fellow medical staff members and hospital administration officials. This sometimes led to assertions of willful mal-intent. Fortunately this view did not prevail.

I hold to the proposition that Dr. Rinaldi's behavior for which he was charged is not best understood as willful mal-intent but as a product of his affliction and impairment of Adult Attention Deficit Disorder and Cognitive Disorder.

In summary: Every expert evaluating the defendant has found some mental health issue impacting Rinaldi. The disagreement is the extent and nature of the mental health problems and the impact of those problems on Rinaldi's ability to formulate criminal intent to commit fraud.

Respectfully submitted,

*Robert E. Chapman*

Robert E. Chapman, M.D., MBA
Diplomate American Board
of Forensic Psychiatry

REC:ph