**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 01-30110 |
| | ) | |
| | ) | |
| SERGIUS RINALDI, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

NOW COMES the United States of America, by Jan Paul Miller, United States Attorney

for the Central District of Illinois, and Patrick D. Hansen, Assistant United States Attorney, and

respectfully submits its memorandum regarding sentencing issues.

I.      **Introduction**

A.      Background

Sergius Rinaldi was an orthodontist with offices in Springfield and Edwardsville, Illinois.

*In re Grand Jury Proceedings*, 280 F.3d 1103, 1105 (7th Cir. 2002).   Among his clients were

wards of the State of Illinois under the protection or custody of the Illinois Department of

Children and Family Services (DCFS) as well as those receiving Medicaid assistance from the

Illinois Department of Public Aid (IDPA). Plea Tr.29,30.  During the years 1994 to 2001, the

defendant submitted claims to DCFS and Medicaid for services regarding these government-

insured patients.  Plea Tr.30.   Among the claims submitted to DCFS and IDPA for payment

were bills for services he did not perform. Plea Tr.30. There were also at least two instances

when he billed IDPA and/or DCFS for putting braces on children, which was simply not done, as

well as for "adjustments" to braces at times when he did not, in fact, see the patients.  Plea Tr.30.

These services were billed even though the vast majority of these patients did not even have

appointments to see the defendant.

The investigation was instituted when one or more of the defendant's employees notified

law enforcement of the fraudulent billing.  Law enforcement was therefore able to learn the

nature of the defendant's practice, the billing procedures, and the records used prior to attempting

to gather these records through the use of grand jury subpoenas.

On or about January 23, 2001, a grand jury subpoena was issued to the defendant

demanding the production of records related to his orthodontics practice by February 7, 2001.

280 F.3d at 1105.  Specifically, the subpoena required the production of, *inter alia*, original case

files and claim forms for selected patients, the explanation of benefit forms for those same

patients, appointment books for the years 1995-2000, patient sign-in sheets, appointment logs,

and records of cancellations.  *Id.*  Instead of producing the records, which may have shown which

patients the defendant actually serviced and which he did not, the defendant removed the records

from his office and refused to produce them.  *Id.* at 1105-06.  After several attempts to secure

compliance by both the government and the district court, Judge McDade held a hearing to

determine if the defendant's refusal to comply was contemptuous.  *Id.,* Ex. B-1 to B-3.  During

the course of the hearing, evidence was presented and testimony given by one of the defendant's

employees which showed that the defendant intentionally removed records (including the sign-in

sheets and similar reports) from his Springfield office after being served with the subpoena.  *Id.*,

Ex. B-1. Additionally, law enforcement officers testified that shortly before a search was to be

conducted at his Edwardsville office for records, he was seen removing a box containing some of

2

these same records and hiding them by a dumpster outside a McDonald's restaurant.  *Id.* at 1105, Ex. B-1.

During the contempt hearing, the defendant testified on his own behalf.  *Id.* at 1106, Ex. B-1.  At the conclusion of the hearing, Judge McDade stated that he gave "absolutely no credence" to the defendant's testimony and found that "Dr. Rinadi ha[d] lied" and "had not been truthful with the Court."*Id.*  The Court found the defendant still had the records covered by the subpoena, found him in wilful contempt for refusing to produce them, and ordered him to be held in prison and fined until he complied.  *Id.* at 1106-07. The defendant remained confined until his indictment in November 2001.

The indictment alleged a broad scheme to defraud the Medicaid system in the State of Illinois which occurred over a seven-year period, with submitting false documents to the Illinois Department of Public Aid when it attempted to audit his practice (Count 12), and with obstructing the criminal investigation into his actions by removing and hiding records. R.1. Following his indictment, the defendant filed a slew of pre-trial motions. R.8-28.  In response, the government asserted that the defendant was presented (through counsel) with virtually all investigative reports and documents prior to his indictment.  R.29,p.11.  Prior to the court ruling on all of these motions, the defendant filed a plea agreement with this Court, agreeing to plead guilty to charges of mail fraud (Count 1) and obstruction of a health care fraud investigation (Count 13).  R.36.  This was supplanted by an amended plea agreement filed March 5, 2001, R.39,which corrected certain typographical errors and one date.  Plea Tr.3.

The defendant's sentencing was delayed several times due to the difficulty of calculating an accurate loss figure without the records the defendant contemptuously withheld from the

grand jury and district court. R.45,46,47,49.  In November, 2002, the government notified this

Court that it was unable to determine an accurate loss amount due to the actions of the defendant

and was prepared to present the evidence available and request this Court depart upward from the

guideline level to compensate for the lack of records. R.53.  The government also objected to any

further continuances. R.53.  This Court set the matter for sentencing in March, 2003.  R.55.

In January, 2003, the defendant moved to withdraw his plea of guilty. R.61.  In this

motion, the defendant suggested that despite the statements made under oath at the hearing

regarding his plea of guilty, and despite exploring all of his defenses with two attorneys, he had

nonetheless since discovered that he had valid defenses to the charges. R.61. One of these "new"

defenses dealt with his billing system with DCFS and IDPA, which he allegedly learned

"subsequent to his plea of guilty" was a "bundled fee procedure.[1]"R.61. The defendant also

asserted that "the defense has learned subsequent to the plea of guilty that any mistakes made by

the defendant with respect to record keeping or the concealing of documents was the result of a

DSM IV diagnosis of Adult Attention Deficit Disorder...and not criminal intent."  R.61,pp.9-10.

The defendant went on to argue that with this diagnosis, "the defense will focus on the inability

of the prosecution to prove beyond a reasonable doubt that Dr. Rinaldi possessed the requisite

intent to commit the charged offenses."  R.61, pp.18-19.  The government responded by

correcting numerous factual misstatements made by the defendant, and noting the legal

---

[1]The government presented substantial documentation to this Court rebutting this incredible argument, including correspondence from DCFS and IDPA to Rinaldi warning him against submitting charges for services he did not render, and evidence that the audit of Rinaldi conducted by IDPA actually cited him for this practice, and counseled him on Section 103 of the provider manual. R.65, 66. As this Court found in denying Rinaldi's Motion for Reconsideration, these were issues known to the defendant at the time of his plea and were voluntarily forfeited by the entry of his plea.

insufficiency of his motion.  R.65,66.  This Court denied the motion on February 27, 2003,

finding that there was "nothing deficient about Defendant's guilty plea,"  R.67,p.1. and that his

motion "flies in the face of the testimony he provided...." R.67,p.8.  This Court further noted that

it "cannot allow Defendant to withdraw his plea because he has concocted, after a year of plotting

and planning, defenses to the crimes charged." R.67,p.15, concluding that it was leery of such

"obviously tactical moves by defendants."  R.67,p.18.

     The defendant requested this Court reconsider its denial on March 19, 2003, once again

making false factual allegations regarding the events surrounding his plea, as well as suggesting

that his recently-diagnosed psychological condition was not known at the time of his plea.  R.69.

The government responded by again correcting the numerous factual misstatements, pointing out

"blatant misrepresentations," and submitting that the defendant's claim of AADD was not a

claim of "factual innocence" that, if true, could support his motion, but was instead simply one

aspect of evidence, if admitted at all, and would be weighed against the overwhelming evidence

of the defendant's criminal intent. R.70,p.5.   This Court denied the defendant's first Motion to

Reconsider on December 9, 2004, finding, among other things that it "declines to hold that the

presence of even a large number of [AADD] symptoms precludes an individual from forming the

requisite intent to defraud."  R.129,p.17.  Further, this Court found that the defendant's "bundled

fee" argument was known to him prior to the entry of his guilty plea, and therefore, there was no

change in circumstances which would allow him to resurrect such an argument following this

Court's acceptance of the plea.  The matter was then set for sentencing.

     The defendant has since filed yet another Motion For Reconsideration.  This motion, filed

on the eve of sentencing, could be seen as another attempt to stall the proceedings.  Nevertheless,

the defendant brings forth no issue which he did not know, or should not have known using proper diligence at the time of his first motion for reconsideration–or at the time of his initial Motion to Withdraw for that matter.  The government will respond to that latest motion in a separate filing.

B.      Issues For Sentencing

A presentence report (PSR) was prepared by Senior U.S. Probation Officer Kevin Kelly. The report calculated advisory sentencing guidelines based on the 2002 United States Sentencing Guideline Manual.  In that report, officer Kelly determined that the base offense level for mail fraud is a level 6, that based on calculations submitted by the government, the loss amount for which the defendant is responsible is between $10,000 and $30,000, and the defendant had earned enhancements of 2 levels each for abuse of a position of trust (USSG. §3E1.3) and obstruction of justice (USSG §3C1.1).

By letter to the U.S. Probation Officer dated May 19, 2005, the defendant submitted objections to the portions of the PSR dealing with the loss calculations and obstruction of justice. There has been no objection filed to the enhancement for abuse of position of trust.   The defendant further suggested that he should receive a downward departure from any sentencing guideline calculation due to "diminished capacity."

By letter dated May 11, 2005, the government submitted that it had no objections to the PSR, but suggested that an upward departure from the sentencing guideline range is warranted, as the loss calculated seriously understates the defendant's conduct in this case, and due to the defendant's overwhelming and continued acts of obstruction of justice.

6

II.    **Amount of Provable Loss**

As has been previous noted by the government, and as will be set forth more thoroughly

herein, a precise loss calculation cannot be made in this case due to the defendant's intentional

and continuing obstructive acts of removing, secreting, and possibly destroying his business

records to keep them from the government.  Nevertheless, through interviews with former

employees, patients and their guardians, and through collateral records maintained by these

sources of information, it can be determined that some loss has, in fact, occurred.

The defendant, an orthodontist, was a "provider" with the Illinois Department of Public

Aid.  He also, however, had an agreement with the Illinois Department of Children and Family

Services to provide orthodontic services for children placed in the custody of the State.  A

majority of the defendant's fraudulent billing resulted from his submission of bills (submitted to

DCFS on a form "C-13") for these children in foster homes and other custodial settings.  This

arrangement allowed the defendant to bypass the typical process of submitting his billings to

IDPA or through its intermediary, Doral Dental, and resulted in the approval of many payments

for children and services that may not have otherwise met the IDPA guidelines.[2]   According to

Susan Hanback, a former Public Service Administrator with IDPA, the billing process for DCFS

clients began with the defendant providing a "treatment card" billing to the DCFS client's

caseworker.  The caseworker would then complete a C-13 form, and submit it to Hanback at

IDPA.  The C-13 was then processed and submitted to the State of Illinois Comptroller for

payment.  The billings, therefore, bypassed the normal procedures associated with Medicaid

---

[2]As submitted with the government's prior responses to the defendant's motions (R.65, Exhibit 4 and R. 66, Exhibit 1), DCFS specifically notified the defendant to cease billing for children who were not receiving the service being billed on several occasions.

billing for dental services in the State of Illinois, and greatly expanded the opportunity for the defendant's fraudulent scheme to continue.

A.     Government Calculations and Exhibits

The loss in this case centered on fraudulent billing – the billing for services not rendered. There are at least two categories of charges that made up the defendant's fraudulent billings.  The first is billing for putting braces on children that never occurred, and the second is billing for office visits that never occurred.

1.     The defendant's practice

According to the people employed by Rinaldi to take care of his office and billing, any patient who came in the office would have to put their name on a daily "sign-in sheet" which was kept at the reception desk in the front of the office, along with an appointment list for that day, and a daily cancellation log. Once the patient signed the sheet, the office worker would pull the patient's file and put it in order for Rinaldi to treat the patient.  *See* Testimony of Judy Keran, Tr. 7/10/01 pp. 90-127 (Submitted to this Court as Exhibit B-1.)  Rinaldi would also have a copy of a blue daily schedule sheet, and he would note the treatment provided on that. Ex. B-1, p. 94. There was also a weekly schedule sheet made up for Rinaldi. Ex. B-1, p. 95.

Each day, the sign-in sheets and schedule sheets would be kept chronologically in a desk and periodically moved to a closet storage area.  Several years of these sheets were maintained in that area, according to Judy Keran. Ex.B-1, pp.96, 98.

To calculate an accurate loss, it would be a simple and accurate process to compare these sign-in sheets or daily schedules with the billings actually generated to DCFS and IDPA.  The same may be done with the daily cancellation sheets or the weekly schedules.  However, none of

these records were provided in response to the Grand Jury subpoena served on the defendant on

or about January 23, 2001. Instead, the documents were removed and hidden by the defendant.

As late as October 3, 2001, Judge McDade found that,

> Dr. Rinaldi has not yet explained or satisfied the Court that the
> sign-in sheets and other records contained in the closet that were
> covered by the subpoena are not under his control since he told his
> office worker that he had taken care of them. And if he destroyed
> or threw away those records after January 23rd, he has steadfastly
> refused to state that to the Court.
>
> For reasons which I do not understand, Dr. Rinaldi seems
> reluctant to directly address the concerns of the Court in detail
> explicitly what happened to the records that were located in the
> closet. I am completely satisfied that the only way to interpret - -
> the only reasonable way to interpret the concern of the office
> worker that the records were missing from the closet is that was an
> unusual event and she wanted to know what happened to the
> records.
>
> So, the bottom line is, upon review the Court finds that Dr.
> Rinaldi has again failed to satisfy the Court as to the unavailability
> of the records or their destruction by him, and he's still in civil
> contempt until he does so.

Ex. B-3, pp.37-38. The defendant's motives for removing, secreting, and possibly destroying the

only documents which would show the patients actually treated by him are now very clear.

These documents would allow this Court to accurately determine the amount of money Rinaldi

defrauded from the Medicaid program.[3]

2.     The Government's Calculations

Since the best evidence is not available to the government, efforts have been made to

---

[3]This motive was also recognized by Judge McDade when he told the defendant "[b]ut I'm
getting the feeling that, you know, I - - not I - - someone could say that there's a certain logic to
refusing to disclose and getting a civil contempt sentence as contrasted with a conviction for fraud.
That may have a ten-year sentence, so that six months is - - is an attractive outcome."(Ex. B-3, p.17)

determine loss through collateral sources, primarily the defendant's former patients and their guardians.  Unfortunately, there are two main barriers to this attempt.  First, and most obviously, it is difficult for patients treated in the 1990s to recall at a much later date whether they were in the defendant's office on any specific date.[4]  Additionally, the evidence is such that many of the billings submitted by the defendant were for dates simply made up by him or, at his direction, by his staff.  These dates would not coincide with any appointment, as there would be no appointment.[5]  Therefore, it is not sufficient to conclude that if a person did not miss any scheduled appointment, that there would be no fraudulent billings in that person's name.

The government has simply been unable to overcome the defendant's acts of contempt and obstruction.  It has, instead, been forced to rely on only those instances when corroborative evidence exists that the child received no service (such as personal calendars from foster parents or official logs from DCFS) , or otherwise when logic dictates a child could not have received services, such as in the case of those incarcerated or who had run away from their homes or foster homes.  Using those areas as a guide, Government Exhibit A, submitted contemporaneously herewith under seal, is a spreadsheet, prepared by Illinois State Police employee Susan Jackson, summarizing those instances when it could be determined that the children received no services.

The first two columns of the exhibit identify the patient by name and recipient ID number (assigned by IDPA).  The third column identifies whether the patient was processed through the

---

[4]The government has previously pointed to this fact as one of the major flaws in the defendant's attempts at a statistical analysis.

[5]This is particularly evident for the patients listed on the attached exhibits with several monthly bills although they were runaways, in jail, or had already had braces removed.  These individuals would not have had appointments, and therefore, would have no idea that the defendant was billing for services he supposedly rendered to them.

normal IDPA procedures, or through DCFS. The fourth column sets forth the total amount of the

false billings identified through interviews with the patients and/or their guardians, and by review

of the records indicated. The fifth column was added to give this Court an option of considering

whether the IDPA Dental policy manual allowed for two billings with no services provided. [6]  In

that manual, as explained by the government in its original response to the defendant's Motion to

Withdraw Plea, R.65, section D-218.3 allows for the billing for patients in "active treatment,"

and then defines patients who are in "active treatments" to be those who have not missed two

monthly appointments. Without the records withheld by the defendant, it is impossible to

determine whether some of these individuals actually had appointments that were missed.

Regardless, the amount of loss for both of these columns remain within the broad guideline range

found by the PSR. Finally, the last column, captioned "reasons/remarks" lists the factors relied

upon by Jackson in counting the amounts listed.

   In addition to simply summarizing the evidence relied on by the calculations, the

government has also submitted as Exhibits A-1 through A-47, which are the source documents

(reports of interview, notes, calendars, etc.) used to determine that the child received no service

from the defendant on the dates indicated.

   The spreadsheets indicate that from the 47 clients reviewed, the defendant obtained at

least between $16,490.79 and $25,298.20 through his fraudulent billing schemes. At least two of

these children, listed on the exhibit by name, but identified herein with the initials of JA and DP,

never even received braces from the defendant, and patient NB had her braces removed more

---

   [6]The government simply does not read this manual to allow the fraudulent practices as
conducted by the defendant. However, as previously noted, it pretty clearly disputes his arguments
for "bundled" or "pro-rata" billing.

than a year before the defendant stopped billing.  Many others were out of State, incarcerated, or runaways.

C.     Witnesses

The government intends to present evidence from one or more of the former employees of the defendant.  Among those under subpoena are Gloria Cravens, Judy Keran, Michele Good and Doris Schuh.  It is expected that these witnesses will testify to the procedures the defendant used to bill, and, as importantly, the directions Rinaldi gave them to bill for children that did not receive services on those dates.

The government will also be prepared to call Susan Jackson to testify regarding the loss summary, attached as Exhibit A, and the process she used in preparing it for this Court.

## II.     Obstruction of Justice

In the objections the defendant submitted to the U.S. Probation Office, he states that "the defendant did not enter a plea of guilty to removing sign up sheets and appointment books and denies the allegation."  Letter of Def. p.2 (Attached as Exhibit C).  Once again, the defendant attempts to revise history to disclaim liability.

At the hearing on the defendant's plea, the government set forth its factual basis for the obstruction charge, stating,

> Additionally, as to Count 13, the Government's evidence would show that the Defendant became aware federal investigators were looking into his billing practices when he received a grand jury subpoena for records on or about January 23, 2001.  **Between January 23, 2001 and July 3rd, 2001, he removed certain records from his office that were responsive to the subpoena and did attempt to obstruct and prevent communication of these records to the investigators.**  On or about July 3rd, 2001, the Defendant was seen removing certain records from his office in

12

> anticipation of a search by federal agents later that day. The
> records were recovered and did include certain sign-in sheets and
> recap sheets which were, in fact, responsive to the subpoena
> previously issued.

Plea Tr.31 (emphasis added). The defendant and two of his attorneys agreed with the government's recitation of facts, and did not dispute or disagree with any of the facts stated. Plea.Tr.32-34. Furthermore, the defendant made the following statements in an exchange with the Court at his plea hearing:

| | |
|---|---|
| THE COURT: | Very well. As relates to Count 13, did you receive a Grand Jury subpoena for records on or about January 23, 2001? |
| MR. RINALDI: | Yes, I did. |
| THE COURT: | Between the dates of 1-23-01 and 7-3-01, did you remove certain records from your office that would have been responsive to the subpoena and underlying investigation? |
| MR. RINALDI: | Yes, I did. |

Plea Tr.p.34.

The defendant now seeks to limit this plea to only the acts which occurred **on** July 3, 2001, and completely ignore the acts taken between the receipt of the subpoena on January 23, 2001, and the date he was caught red-handed on July 3. He did not do so at the plea hearing, however. Instead, as the transcript clearly shows, he offered his plea of guilty to removing records from his office between those dates and preventing communication of those records to investigators in addition to the actions of July 3, 2001.

As noted, this was not the first time that the defendant saw, heard, and was faced with the government's evidence of his obstruction of justice. According to the reported decision of the Seventh Circuit Court of Appeals,

13

(Judy) Keran (an employee of the defendant) then testified that sometime after January 23, 2001, Rinaldi removed all the sign-in sheets and appointment books that were stored in the closet. Keran noted that she went into the closet on a daily basis and that the sign-in sheets and appointment books were removed from the closet "definitely after the [issuance of the] subpoena" on January 23, 2001. Keran stated that she asked Rinaldi about their removal, and that Rinaldi told her that he had removed the sign-in sheets and appointment books. Keran was then asked whether Rinaldi had destroyed any records on any previous occasion. Keran responded, "[a]bsolutely not. Dr. Rinaldi did not want us to destroy anything. He likes ... to keep everything ... down to the simplest items" and that Rinaldi saved records "just in case" they were needed in the future.

Rinaldi then testified on his own behalf. He stated that he had not destroyed or removed any sign-in sheets since the service of the subpoena. Rinaldi testified that he had placed the box in the dumpster because he deemed the material "personal" and not responsive to the subpoena. He then stated that contrary to Keran's testimony, all the sign-in sheets were systematically destroyed within one or two months after their creation. Therefore, Rinaldi concluded, he could not produce any responsive documents because the documents no longer existed.

At the conclusion of the hearing, the court made several factual findings and credibility determinations. Specifically, the court noted that it gave "absolutely no credence" to Rinaldi's testimony and found that "Dr. Rinaldi ha [d] lied" and "h[ad not] been truthful with th[e] Court." Further, the court found that the records did exist because "[t]he fact that ... [Rinaldi] had been observed taking a box of records out of his office and putting them in or by the Dumpster persuade[d] the Court that [Rinaldi] ha[d] these ... records in his possession [but was] not turning them over." Further, the court noted that there had "been no accounting for the boxes of records that Judy Keran put together and put in the" Springfield closet. The court then stated that there had been "no evidence" that Rinaldi destroyed the evidence. Therefore, the court concluded that it found that the documents were in still existence, that they were in Rinaldi's possession or control, and that Rinaldi would not produce the records voluntarily.

*In re Grand Jury Proceedings*, 280 F.3d 1103, 1106 (7th Cir. 2001), *cert. denied*, 536 U.S. 925

(2002). *See also* Exhibits B-1 through B-3. The record in this case is simply replete with

evidence that the defendant obstructed justice, lied to Judge McDade, and essentially did

14

everything possible to willfully obstruct and impede the administration of justice during the course of the investigation, prosecution and sentencing of the offense of conviction, as well as all relevant conduct.  *See* USSG. § 3C1.1.  The 2-level enhancement for obstructing justice is not only well earned by the defendant, it alone is insufficient to punish the defendant for this conduct and deter him from continuing to do so.

III.    **Fine and Restitution**

Based on the loss calculations set forth in the pre-sentence report, and this filing, this Court should order the defendant to repay IDPA for the total amount of $12,699.06, which represents one-half of the amount of loss to the Medicaid system.  Further, this Court should order an additional amount of $12,699.06 to the United States Center for Medicare/Medicaid Services (CMS) which represents the additional one-half of the amount paid to the defendant with Medicaid funds.

Additionally, "the court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a) (emphasis added).  The defendant then has the burden to show that he is "unable" to pay and are "unlikely to become able" to pay a fine.  *United States v. Flores-Sandoval*, 94 F.3d 346, 351 (7th Cir. 1996).  This is a heavy burden because "almost everyone has or will acquire some assets at some time."  *United States v. Sanchez-Estrada*, 62 F.3d 981, 989 (7th Cir. 1995). Presuming the defendant is found to be at a guideline level of 14, the sentencing guidelines set the fine range of from $4,000.00 to $40,000.00.  To achieve the maximum deterrent effect in the medical community, this Court should impose the maximum fine allowed by law on the defendant.

15

IV.     **Departure Requests**

A.      Defendant's Request For Downward Departure

The defendant suggests that he should receive a downward departure from the range

suggested by the United States Sentencing Guidelines due to some concept of "diminished

capacity."  The United States Sentencing Guidelines provide for a possible departure for a truly

diminished capacity in § 5K2.13.  This section provides, "A sentence below the applicable

guideline range may be warranted if the defendant committed the offense while suffering from a

significantly reduced mental capacity...." The Sentencing Commission defines "significantly

reduced mental capacity" as "a significantly impaired ability to (A) understand the wrongfulness

of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior

that the defendant knows is wrongful." USSG § 5K2.13, comment. (n.1).  This provision has

been very narrowly construed by the courts.

Guideline § 5K2.13 is permissive rather than mandatory.  In other words, even if a judge

finds that the defendant committed the offense while afflicted by a significantly reduced mental

capacity, he is not required to reduce the defendant's sentence; he is merely authorized to do so.

*United States v. Dyer*, 216 F.3d 568, 569 (7th Cir. 2000).  His exercise of that authority, or

decision not to exercise that authority, is unreviewable. *Id.* at 570.

A good illustration of the limits to the use of § 5K2.13 is found in the case of *United*

*States v. Ferron*, 357 F.3d 722 (7th Cir. 2004).  There, once the Court found that the defendant

knew the difference between right and wrong, the matter was virtually settled.  *Id.* at 725.  In that

case, the defendant, a medical doctor, pleaded guilty to one count of bank fraud for selling

collateral pledged to the bank for a line of credit.  *Id*. at 723.  The defendant sought a downward

16

departure from the sentencing guideline range, citing, among other things, a psychological

evaluation suggesting that she was suffering from a variety of disorders, including adult attention

deficit disorder (ADD).  *Id.*  According to testimony presented at sentencing by the defendant's

psychologist, the defendant could not concentrate on financial matters, and, therefore, was

required to rely on others to direct and make financial decisions for her.  *Id.* at 723-4.  The

defendant's expert acknowledged, however, that the defendant was competent, "understood the

difference between right and wrong, and the difference between a lie and the truth" and that she

did not suffer from a compulsive disorder which would cause her to steal.

Once it was established that the defendant understood the difference between right and

wrong, the matter was no longer in question.  According to the Court,, "[a] single statement

which could be more damaging to [defendant's motion for downward departure] is hard to

imagine."  *Id.* at 725.

The government submits that the various medical reports submitted by the defendant do

not meet that basic criteria under USSG § 5K2.13, as they do not even suggest that the defendant

did not understand the difference between right and wrong.  Therefore, this Court should not

permit the defendant to put on lengthy evidence regarding his mental status or abilities unless he

is first able to establish that those medical professionals will testify that, at the time of the

offenses, he did not know right from wrong.  Without this, their testimony would not be relevant

to the issue of whether this Court should exercise its authority to grant a downward departure

because of his diminished capacity.

Additionally, there has to be some causal connection between the defendant's mental

condition and his criminal conduct in order to warrant a punishment discount under any set of

penal goals. *Dyer*, 216 F.3d at 571. According to the Seventh Circuit, if this Court finds that the defendant would have committed the crime anyway (despite the mental illness allegedly suffered), there would be no possible justification for reducing the sentence other than that the judge felt sorry for the defendant – which would be just the kind of ad hoc, unfocused sentencing judgment the guidelines seek to purge. *Id.* This, the Government submits, would lead to an "unreasonable" sentence.

This Court, after considering all of the reports of the psychologists, psychiatrists and other medical professionals hired by the defense, as well as considering the opinions of Drs. Bornstein and Appleton, and finally after considering the opinion of its own expert, has already answered this question. By finding that the defendant's alleged diseases had no bearing on his criminal intent, R.129, pp. 15-17 (Court's order of December 9, 2004), this Court has essentially answered the question and found that despite the defendant's allegations of mental disease, and regardless of whether the Defendant has the characteristics consistent with ADD, these factors did not contribute to his violation of the law. Therefore, it would be unreasonable for this Court to depart from the guidelines and give the defendant any benefit due to an alleged disease with no causal connection to his criminal conduct.

With this in mind, the government urges this Court to disallow the anticipated testimony of the parade of medical professionals the defense suggests it will present.[7] The defendant has submitted all of the medical reports to this Court in previous filings (including a follow-up report

---

[7]Because of the standards set by the Guideline interpretation, and the fact that **none** of the defendant's "experts" have opined that the defendant does not know right from wrong, the Government submits that the defendant's insistence on calling these individuals in a sentencing hearing is a tactic simply to attempt to bolster the defendant's claim that this Court erred in refusing to allow him to withdraw his plea of guilty.

18

from Dr. Chapman), and this Court has reviewed them all. This Court should therefore reiterate that even should the medical professionals testify consistently with the opinions expressed in their reports, that this Court will not depart from the guidelines on this basis. There is no need to belabor the point through several days of testimony.

2.    Government's Request For Upward Departure

In addition to refusing a request to depart downward from the sentencing guideline range, the government submits that this Court has ample evidence before it to depart upward from the range set by the sentencing guidelines. This is due to the provable loss amount substantially understating the seriousness of the offense (USSG §2B1.1, comment. (n.19), to the extraordinary and repeated acts of obstruction of justice and contempt of court, and the disruption of Government function caused by his crimes (USSG § 5K2.7).

A.    Seriousness of the Offense

As outlined in Section II of this Sentencing Memorandum, the defendant's actions have made it impossible to properly calculate the amount of money the defendant profited from his fraudulent practices. Should this Court simply sentence the defendant on the basis of the "provable" loss, the defendant will have succeeded in his ultimate goal–to completely thwart the criminal justice system and evade responsibility for the full amount of his criminal activity. This cannot be allowed. It is important for this Court to impose a sentence that will indeed reflect the seriousness of not only the offenses underlying his convictions, but also to provide a strong message to the community (both medical and otherwise) that obstructing justice and showing contempt for the Court and Grand Jury will be met with strong consequences, and that no benefit will be allowed for those who successfully hide and destroy those critical records. Without this

19

message, Sergius Rinaldi – who has already managed to avoid punishment for 3 years– will indeed be the carrier of a message to the community, but the wrong kind of message.

This Court is aware that this offense took place on numerous occasions over a lengthy period of time.   The time charged in the indictment, 1994-2001, was selected for prosecution as this was the time period that certain government witnesses were employed by the defendant and had personal knowledge of his fraudulent billing.   There is no doubt in the minds of these employees that the fraudulent practices occurred prior to their employment as well; nor is there any doubt that if the government had not put an end to the practice by charging Rinaldi with this massive scheme to defraud, he would still be submitting claims for services he did not render. Estimates from former employees ranged from between 20% to 40% of the defendant's total billings to IDPA and DCFS were for services he did not render.

The amount provable by collateral evidence, $25,298.20, is, therefore, a fraction of the actual amount stolen by this defendant.  It would be reasonable, therefore, for this Court to find that the Guideline calculations do not fully reflect the seriousness of the offense.

B.      Obstruction of Justice/Contempt of Court

A great concern for the government in this case has been the repeated acts of Rinaldi showing obstruction of justice in refusing to comply with a Grand Jury subpoena, and absconding with several years' of records.  However, this Court should note that he continues to engage in a pattern of showing contempt for the power of this Court by not only refusing to turn over records, but by now his arrogant insistence that he cannot be sentenced for sentencing guideline amount not "proved" by the government.  *See* Exhibit C, Letter of Thomas Dawson to Kevin Kelly of May 19, 2005 ("If the Government is correct that a calculation cannot be

determined by a preponderance of the evidence then the legal standard cannot be met and the

defendant cannot be held accountable for an imaginary loss or a loss based on speculation.").

The Government has submitted to this Court the record of the contempt proceedings held

in the summer of 2001 by then Chief-Judge McDade.  (Exhibits B-1 through B-3)  In considering

the history and characteristics of the defendant, and whether a sentence within the guidelines will

be sufficient recognition of the factors in 18 U.S.C. § 3553, this Court should pay particular

attention to the manner in which the defendant conducted himself when brought before Judge

McDade.  Very telling during these proceedings was the defendant's actions when called to

testify on July 10, 2001.  Instead of raising his right hand to be sworn, the defendant raised his

left. (Ex. B-1,p.51).  He then proceeded to perjure himself repeatedly. (Ex. B-1, pp.135-36)("...I

give no credence to [Rinaldi's] testimony.  I think Dr. Rinaldi lied.  I don't think he's been

truthful with this Court.  I think that records do exist.")

This Court is acutely aware of the defendant's shifting positions following his pleas of

guilty.  Although testifying under oath before the United States Magistrate Judge as to his

fraudulent and obstructive actions, he has spent the past two years or so denying any culpability

in these crimes.  The reports of the different psychologists and psychiatrists he has visited all

paint the picture of an individual who blames everyone else for his legal problems, and who has

no hesitation to attempt to mislead or color the facts as he believes suits his purpose.

While the PSR in this case suggests a 2-level enhancement for obstruction of justice, the

government submits that the defendant's actions in this case are so far beyond anything

contemplated by the sentencing commission, that it takes this case out of the "heartland" of the

typical obstructive defendant.  He has earned substantially more than a two-level enhancement,

21

and the government requests that this Court should consider such in fashioning a "reasonable" sentence for this defendant.

C.    Disruption of Government Function

If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected.   USSG § 5K2.7.  In this case, Rinaldi's conduct significantly disrupted the government's ability to administer its Medicaid program– particularly as it pertained to wards of the State of Illinois.  As has been discussed by both the government and the defense throughout these proceedings, Rinaldi was one of the few, if not the only, provider selected by DCFS to provide orthodontic services to the children under its guardianship in Central and Southern Illinois.  Every time he fraudulently billed Medicaid, directly and through DCFS, the government lost funds that it otherwise could have used to provide medical care to eligible Medicaid patients. *See United States v. Regueiro*, 240 F.3d 1321 (11th Cir. 2001).  Additionally, in this case, when the defendant was finally caught and indicted (actually when he was jailed by Judge McDade for contempt of Court), and then mysteriously "lost" certain records, he seriously disrupted the ability of DCFS to properly fill the needs for the children in its custody.

**V.    Other Sentencing Factors - 18 U.S.C. §3553**

At the risk of repeating certain issues addressed in other sections of this memorandum, the government notes that 18 U.S.C. §3553 requires this Court to consider additional factors. Among these factors are:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

The government submits that this memorandum adequately states the nature of the offense and the history and characteristics of this defendant. Both the history and characteristics weigh heavily in favor of sentencing the defendant to a term of incarceration well beyond the Sentencing Guideline range found in the PSR.

(2) the need for the sentence imposed—

      (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

As noted previously, a great concern for the government in this case has been the repeated acts of the defendant showing obstruction of justice in refusing to comply with a Grand Jury subpoena, but showing contempt of the power of this Court in refusing to turn over records, and now his arrogant insistence that he cannot be sentenced for sentencing guideline amount not "proved" by the government. As the defendant is well aware, by removing, secreting and possibly destroying his sign in sheets, daily appointment logs and weekly logs, he has taken away any opportunity to determine with any reasonable accuracy, the full extent of his fraudulent conduct. The mere fact that this matter has been awaiting sentencing for over 3 years is testament to this fact. No reliable statistical analysis is possible, and no recreation of these records is feasible due to the nature of the practice, and now, the passage of time.

Should this Court simply sentence the defendant on the basis of the "provable" loss, the defendant will have succeeded in his ultimate goal–to completely thwart the criminal justice system and evade responsibility for the full amount of his criminal activity. This cannot be

23

allowed.  It is important for this Court to impose a sentence that will indeed reflect the seriousness of not only the offenses underlying his convictions, but also to provide a strong message to the community (both medical and otherwise) that obstructing justice and showing contempt for the Court and Grand Jury will be met with strong consequences, and that no benefit will be allowed for those who successfully hide and destroy those critical records.  Without this message, Sergius Rinaldi – who has already managed to avoid punishment for 3 years– will indeed be the carrier of a message to the community, but the wrong kind of message.

<div align="center">(B) Afford Adequate Deterrence to Criminal Conduct</div>

A strong message in the form of a lengthy jail sentence would also serve the requirement of § 3553 (a)(1)(B), and "afford adequate deterrence to criminal conduct."  In addition to making a strong statement that obstruction of justice and destruction of records will not be tolerated, the Government submits that the sentence to be imposed on Rinaldi must  serve notice on both the medical community that the wholesale looting of the Medicaid system will be met with strong consequences.

<div align="center">(C)    To Protect the Public From Further Crimes of The Defendant</div>

This Court must also consider a sentence that will protect the public from further crimes of the defendant.  18 U.S.C. § 3553 (a)(1)(C).  Since the defendant is no longer a "provider" in the Medicaid system, he cannot continue his criminal activity in that realm.  In showing such a strong disregard for the law, however, further crimes of this defendant cannot be underestimated.

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner ;

At the defendant's age and educational level, there does not appear the need to provide

<div align="center">24</div>

this defendant with any additional training.

## VI.    Self Reporting

Self reporting to a penal facility is a privilege that should be reserved for a select few convicted individuals.  In this case, the defendant has used every method at his disposal to delay his indictment, plea, and now, his sentencing.  He has obstructed justice, hidden records and created excuses for his illegal actions.  The major reason to allow individuals to self report is to allow them the opportunity to complete tasks and tie up any loose ends necessary prior to their incarceration.  In this case, the sentencing has been continued over 3 years due to the defendants' actions.  By this Memorandum, the defendant is on notice that the government will not agree to any request to stall his incarceration, so if there are any additional "loose ends" to tie up, he will presumably do so prior to September 15, 2005.   Should this Court impose terms of incarceration, there is no reason to again delay the inevitable.   The government, therefore, respectfully requests that any sentence imposed by this Court take effect immediately.

Respectfully Submitted,

JAN PAUL MILLER
UNITED STATES ATTORNEY


By:    s/Patrick D. Hansen
Patrick D. Hansen
Assistant United States Attorney
Illinois Bar No. 6187536
318 South 6th Street
Springfield, IL 62701
Telephone: (217) 492-4450
patrick.hansen@usdoj.gov

25

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2005, I mailed the foregoing by United States Postal Service to the following non-CM/ECF participants:

Thomas M Dawson
2300 S. Fourth Street
Leavenworth, KS 66048

Michael Costello
Attorney at Law
631 East Allen
Springfield, IL 62703

<div style="margin-left: 40%;">

s/Patrick D. Hansen
Patrick D. Hansen
Assistant United States Attorney
318 South Sixth Street
Springfield, IL 62701
(217) 492-4450
Fax: (217) 492-4512
patrick.hansen@usdoj.gov

</div>