IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 01-30110 |
| v. | ) | |
| | ) | |
| SERGIUS RINALDI, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

Comes now, the Defendant, Dr. Sergius Rinaldi, by and through counsel and responds to the Government's sentencing Memorandum.

1. The Government continues to argue to this Court that this was a "broad" conspiracy. The Defendant denies this. The Defendant suggests that the billing was a reasonable interpretation of the many different and conflicting regulations, rules and policies. The Defendant also argues that due to his diminished mental capacity, he was unable to keep his records in order and that any misstatements made on his billing forms were a result of the disorganization caused by his mental illness and that such misstatements were unintentional and not fraud. The Defendant also suggests that the Government's submissions as to the loss in this case include billings that are not the result of fraud and should not be included in any loss calculation.

1

This is one of the main issues this Court must resolve in this sentencing, what part of the Government's claimed loss is actually due to fraud.

One of the great difficulties for the defense of this case has been the Government's ever-changing theories of what the scheme was and misstatements of the details. One example of this is found at page 7 of their sentencing memorandum. There the Government seems to allege that Dr. Rinaldi submitted C-13s to DCFS and that this somehow 'bypass[ed] the 'typical process'. Later in the very same paragraph the Government asserts "the billing process for DCFS clients began with the defendant providing a "treatment card" billing to the DCFS client's case worker. The caseworker would then complete a C-13 form, and submit it to Hanback at IDPA. The C-13 was then processed and submitted to the State of Illinois Comtroller for payment." There are many misstatements within this paragraph of the Government's Sentencing Memorandum, which the Defendant will attempt to correct at this sentencing.

As an example of the shifting allegations by the Government, one needs only to examine the Government's response to the motion to reconsider the withdrawal of the plea and this sentencing memorandum at page 11. Prior to this memorandum the Government has asserted that Medicaid would not pay for missed appointments under any circumstances.

Prior to the entry of the plea in this case, the Government went so far as to assert that the policy reflected in exhibit 1026 had been 'disavowed' because IDPA would not pay for missed appointments as reflected at Chapter 100 of the IDPA's Provider's Handbook". Now they appear to concede that Section 200 of that same Handbook may to permit Orthodontists to bill for at least two missed appointments. They concede this only after three years of investigation and litigation by the Defense. They claim that the loss figure of $25,298.20 when corrected to account for the 'active treatment' rule reduces the loss to $16, 490.79. See page 11 of Government's Sentencing Memorandum. The Defense will present testimony that the $16, 490.79 does not adequately account for the billings properly billed under the active treatment rule and that the loss, if any, is even less than the $16,490.79 alleged by the Government.

The indictment period covers a period of seven (7) years. A fraud that nets $16,000 to $25,000, even if accurate, can hardly be described as broad.

The Defense will present evidence that rather than a broad conspiracy, the alleged loss in this case is more a result of the Defendant's diminished mental capacity that prevented him from keeping the complex records the Government demands. The Government even cites to an example of the Defendant's diminished capacity at page 21 where the recite an incident that

3

did occur during the Defendant's contempt hearing before Judge McDade, where he raised his left hand rather than his right hand when being sworn in. It is hard to imagine that a person with the educational achievements of this Defendant could make such a mistake absent some impaired cognitive functioning. The Government presents this incident as evidence of contempt of court and obstruction, where it really is symptomatic of the Defendant's significantly diminished mental capacity.

The Government asserts at footnote 2 on page seven of their memorandum that "DCFS specifically notified the defendant to cease billing for children who were not receiving the service on several occasions." At the same time DCFS was sending this advice to the Defendant, it was also releasing new or updated carrier manuals and other policy statements that contradicted the advice. The Government also failed to include in their pleadings in this Court the December 15, 1998 re-audit wherein the Office of the Inspector General of the IDPA reduced the recoupment amount from the $14,440.00 to $6,355.00 after staff reviewed the documentation. Of significance to sentencing the re-audit reduced the amount due to "overpayments due to missing records" from $8,250.00 to $1,080.00 and "overpayments due to missing records of specific service" from $1,095.00 to$180.00.

The Government still argues that orthodontists are not paid under a pro rata fee system in spite of all the evidence the Defense has presented to the contrary. See footnote 1 at page 4 of the Government's Sentencing Memorandum. The evidence is that the State pays a set amount for orthodontic treatment. Periodically the amount is revised. A single payment is made to the orthodontist when he performs the initial consult; another set amount is paid to the orthodontist when the appliances are placed. The remainder of the total is paid pro rata over the 24 months of adjustments. The orthodontist is limited to one payment for adjustments per month. So if the orthodontist were to see the patient twice in a given month under this pro rata system, he can only bill once. Conversely, the orthodontist may bill during the pro rata period even if he does not see the patient. It is only in this context that the active treatment rule would be necessary. If, as the Government argues, the orthodontist can only bill when he actually sees the patient, there would be no need for the active treatment rule, as there would be no issue about billing for missed appointments.

### 2. THE GOVERNMENT SUGGESTS THAT THIS COURT SET A STANDARD FOR A DIMINISHED CAPACITY SENTENCE REDUCTION HIGHER THAN THE GUIDELINES PROVIDE.

The Government in their Sentencing memorandum (Doc. 156) at page 16 argues that the Court should not allow the Defendant a sentence reduction

under USSG §5K1.13 for diminished capacity unless he is able to establish that, at the time of the offenses, he did not know right from wrong. Without the Defendant meeting this standard, the Government suggests this court should not exercise its authority to grant a downward departure because of his diminished capacity."

The Government relies on *United States v. Ferron,* 357 F.3d 722 (7th Cir. 2004) for support of their contention. In *Ferron*, the District Court, after hearing testimony from the Defense psychological expert, found that the expert's testimony was to be excluded per *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579 (1993). The 7th Circuit found this to be error and an incorrect application of the sentencing guidelines. The Court noted that the Federal Rules of Evidence do not apply in a guidelines sentencing hearing rather the standard is that the Court may admit evidence during sentencing that would not qualify as expert testimony under Fed. R. Evid. 702 as long as the evidence meets a sufficient indicia of reliability standard. The Court held that it was error to exclude the testimony on a *Daubert* basis but was the error was harmless as the judge did actually consider the testimony but found it to be "insufficiently probative to support" the requested departure. The testimony, as the Court of Appeal emphasized was weak: "She *wants* to focus on taking care of patients. She doesn't *want* to

think about the business aspects. She *wants* other people to do that for her." (Emphasis in original.) The reports of the Psychiatric and Psychological experts submitted herein clearly indicate that the testimony will be much stronger in this case, that Rinaldi's mental health issues are more than his wants but rather discuss his ability.

 The Government attempts to compare the ADD evidence in *Ferron* with the evidence here. In *Ferron*, the Defense submitted a report from a clinical and forensic psychologist. The Psychologist also testified. The Decision is not clear as to whether the statement that the expert "also suspected that Ferron suffered from adult attention deficit disorder (ADD)" came from the report or testimony. A significant difference between that case and the one before this court is that the experts have submitted reports and will testify that they hold the medical diagnosis of ADD, which is significantly different than merely "suspecting." Further Dr. Athey, holds the psychological opinion that Rinaldi's condition is more than ADD, that there is also a brain based condition that impairs the Defendant's cognitive abilities beyond what can be accounted for by the ADD diagnosis alone.

 This argument circumvents the actual wording of USSG §5K2.13 which does not require that the Defendant not know right from wrong as the government suggests, rather the standard is whether the defendant

committed these offenses while suffering from a significantly reduced mental capacity. If the Defendant did not know right from wrong he would be legally innocent of the crimes charged. Diminished capacity as a defense to a crime has been described as an imperfect insanity defense. Diminished capacity as a sentencing factor, especially in light of the now advisory guidelines is something different and more significant. The guidelines defines 'significantly reduced mental capacity' as the defendant has a significantly impaired ability to:

> (A) Understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason
>
> OR
>
> (B) The defendant has a significantly impaired ability to control behavior that the defendant knows is wrongful.

The Defendant suggests that the Guideline does not require that the defendant absolutely not know right from wrong but rather that the defendant has a 'significantly reduced capacity' to understand the wrongfulness of the behavior comprising the offense. So the question is not whether the Defendant knows right from wrong in all aspects of his life but rather whether he had a significantly reduced capacity to understand the wrongfulness of the behavior comprising the offense. Part A also contains a

provision for a sentence reduction if the Defendant has a significantly reduced capacity to exercise the power of reason.

The Guideline is written in the disjunctive with an 'or' between parts A and B. The Guideline in part B allows for the reduction even where the Defendant knows the behavior is wrongful but has a significantly reduced capacity to control it.

The guideline also suggests that the amount of the reduction should be related to the extent the reduced mental capacity contributed to the commission of the offenses?

Pursuant to 18 U.S.C. §3553(a) and advisory guidelines, this Court is now free to consider any information related to the factors in 18 USC §3553(a). Guidelines are not mandatory, so the Defendant need not meet the requirements of 5K1.13 for this Court to exercise it's discretion to set a sentence below what would be called for under mandatory guidelines. Defendant suggests that the defendant's mental health status would speak to the necessity of incarcerating this defendant and the to chances he will re-offend. Both of these are factors this Court is required to consider pursuant to to 18 U.S.C. §3553(a)

B. THE GOVERNMENT OVERSTATES THE LOSS THEY CAN PROVE

9

The Government bears the burden of proof in demonstrating the amount of loss caused by the Defendant's mail fraud for sentencing purposes. *United States v. Vivit*, 214 F.3d 908 (7th Cir. 2000).

1. THE GOVERNMENT CONCEDES THAT THE 'ACTIVE TREATMENT' RULE EXISTS AND THAT IT MAY IMPACT THE AMOUNT OF LOSS

The Government states in the sentencing memorandum at page 11: Section D-218.3 allows for the billing for patients in "active treatment" and that active treatment are those who have not missed two monthly appointments. (Emphasis added). This shows that the Provider's Handbook is not consistent between section 100 upon which the court relied on to find that Medicaid would never pay for missed appointments and Section 200 which permits at least two billings for missed appointments. This same 'active treatment' rule is contained in the Doral Office Reference Manuals for **2-20-1999, 7-9-1999,** and 1-7-2001 state**:** To initiate payment on an approved comprehensive orthodontic case, the dental office needs to submit a claim form indicating the date the appliances were placed (banding date). Monthly payments will be made for approved treatment as long as the Client remains eligible and is in active treatment. A Client will not be considered to be in active treatment if they have failed to keep appointments in two consecutive months. If a Client fails to keep an appointment for two consecutive months, the dental office must notify Doral.

The Government then suggests that it had disclosed this active treatment rule to the defense and the Court through footnote 7 to their response to the Defendant's motion to withdraw plea. The document that the Government asserts reflects such disclosure specifically spins the policy statement to require actual treatment. An actual treatment requirement would make the policy meaningless and superfluous. Why would there be provision for payment when a patient missed an appointment if the Doctor can only be paid if he sees the patient? The Government has consistently argued throughout this case that Medicaid will not pay for missed appointments, and now at this late date concedes that might not be the case and that it substantially impacts their loss statement in the pre-sentence report.

2. THERE IS NO CONTINUING OBSTRUCTION.

At page 20 of their sentencing memorandum the Government argues that the Defendant is continuing to obstruct justice by Defense Counsel, Thomas Dawson, sending a letter to the probation officer. The portion of this letter that offends the Government is the statement from it as reported by the Government in their sentencing memo that the defendant cannot be sentenced for sentencing guideline amount not proved by the Government. This is a correct and accurate statement of the law. See, *United States v.*

*Vivit,* 214 F.3d 908 (7th Cir. 2000). Further the Defendant has made the argument that any fact that increases the Defendant's sentence must be plead in the indictment and proven to a jury beyond a reasonable doubt. The Defendant recognizes that there is contrary case-law from this circuit, but also recognizes that the Supreme Court of the United States has yet to rule on the question, and therefore the Defendant must preserve the issue for appeal. The Defendant cannot be punished for providing the probation officer with a correct statement of the law, or for making a good faith argument for an extension of existing law.

4. §5K2.7 "SIGNIFICANTLY DISRUPTED" ENHANCEMENT IS INAPPLICABLE.

At page 22 the Government suggests that the Defendant's sentence should be enhanced pursuant to §5K2.7 as he "significantly disrupted the Government's ability to administer its Medicaid program…" The Government argues that because Dr. Rinaldi was "one of the few, if not the only, provider selected by DCFS to provide orthodontic services to the children under its guardianship in Central and Southern Illinois" his fraud disrupted the Government's ability to properly fill the needs for the children in its custody. The Defense suggests that even if the Court were to accept the Government's loss figures of $16,000 to $25,000 over seven years, this

did not "significantly disrupt" a government function within the meaning of 5K2.7. Further the Defendant has been charged with obstruction and Medicaid fraud. The Guideline states: "Departures from the Guidelines ordinarily would not be justified when the offense is an offense such as bribery or obstruction of justice; in such cases interference with a Governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference. Defendant suggests that this requested enhancement duplicates conduct already accounted for in the sentences for the crimes to which he has plead.

    5. THE REQUESTED ENHANCEMENT FOR OBSTRUCTION IS IMPERMISSIBLE DOUBLE COUNTING.

    The Defendant has been punished for the same conduct during the contempt proceedings and also has plead to an obstruction charge within this same case for the same conduct. To further enhance his sentence for the same conduct charged in the contempt and USSG §3C1.1 is impermissible double counting. *United States v, Austin,* 54 F.3d 394 (7th Cir. 1995). To impose an obstruction enhancement under USSG §3C1.1 for obstruction conduct already considered in the criminal count of obstruction is impermissible double counting. *United States v. Tankersley,* 269 F. 3d 620

(7th Cir. 2002). As it is improper to enhance his sentence for obstruction under 3C1.1, it is more improper to 'super' enhance the Defendant's sentence as the Government suggests at page 21 of their sentencing memorandum.

5. THE DEFENSE CONTINUES TO FIND THAT THE GOVERNMENT HAS FAILED TO MEET ITS DISCLOSURE OBLIGATION

In interviews with David Spinner, he relates that there was some interagency dispute between either IDPA or at least the IDPA Dental Program and the prosecution as to the active treatment rule and its application to Rinaldi specifically. None of the documents related to this interagency discussion have been disclosed to the defense although the exculpatory nature of them seems to be apparent.

There are other incidents where it will be shown that the Government has failed to disclose documents to the Defense.

Wherefore, it is requested that this Court deny the Government's requested enhancements, and hold the Government to their burden of proof as to the loss.

                                      Respectfully submitted:

/s/ Thomas M. Dawson
Thomas M. Dawson, Esq.
Kansas Bar No. 06599
2300 South Fourth Street
Leavenworth, KS  66048
(913) 682-5331
(913) 682-8363 facsimile
dawsonlaw@aol.com

Counsel for Defendant

CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Response to Government's sentencing memorandum upon Patrick D. Hansen, Assistant United States Attorney, by ECF, this 30th day of September 2005.

/s/ Thomas M. Dawson_
Thomas M. Dawson, Esq.